[15 NYS3d 769]

# In the Matter of TBA GLOBAL, LLC, Appellant, et al., Petitioner, v FIDUS PARTNERS, LLC, Respondent.

First Department, September 1, 2015

APPEARANCES OF COUNSEL

*Winston & Strawn LLP*, New York City (*Luke A. Connelly* and *Zachary L. Spencer* of counsel), for appellant.

*Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.*, New York City (*Seth R. Goldman* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.P.

Petitioner acquired a failing business pursuant to an asset purchase agreement that specifically excludes from the assets and liabilities being transferred to the buyer any "brokerage or finders' fees . . . or other similar payments" owed by the seller. The asset purchase agreement further specifically provides that the seller and the buyer will each bear its own "Transaction Costs," which are defined to "includ[e] the fees, costs and expenses of . . . financial advisors." At issue on this appeal is whether, notwithstanding the foregoing express and specific provisions of the asset purchase agreement, respondent Fidus Partners, LLC, which never entered into any agreement with the buyer, may force the buyer into arbitration over Fidus's claim to a fee allegedly owed to it by the seller under Fidus's

agreement to act as the seller's "exclusive financial advisor" in efforts to sell the business. We hold that the buyer has no obligation to submit to arbitration of Fidus's claim.

Because the asset purchase agreement unambiguously provides that the buyer did not assume the seller's liabilities to pay the fees of brokers, finders, or financial advisors retained in connection with the contemplated sale of the business, the buyer did not assume the seller's obligations under its agreement with Fidus, and therefore is not bound by the arbitration provision in that agreement. Neither has Fidus, as the proponent of arbitration, carried its burden of proof in support of its alternative arguments that the seller's contractual obligation to arbitrate disputes with Fidus passed to the buyer under common-law principles of successor liability and estoppel. Accordingly, the buyer is entitled to the relief sought by its petition, namely, a stay of the arbitration that Fidus has commenced against it to recover the fee allegedly owed to Fidus by the seller. We therefore reverse and grant the buyer's petition for a permanent stay of the arbitration.

This dispute arises from the financial difficulties of an entity formerly known as TBA Global, LLC (TBA Seller), which was in the business of designing and producing live-event engagements for clients.[1] In January 2012, TBA Seller retained respondent Fidus to serve as TBA Seller's "exclusive financial advisor" in connection with efforts to identify a new investor to rescue the company. Under a letter agreement between Fidus and TBA Seller, dated January 11, 2012 (the Fidus/Seller agreement), Fidus undertook to "serve as the *exclusive financial advisor* of [TBA Seller] with respect to any sale or similar transaction involving the assets or equity securities of [TBA Seller]; any merger or consolidation involving [TBA Seller]; or any recapitalization or reorganization of [TBA Seller] (hereinafter collectively referred to as a 'Transaction')" (emphasis added). More specifically, the Fidus/Seller agreement obligated Fidus to provide the following services to TBA Seller:

> "1. Analyze the business, properties and operations of [TBA Seller];
>
> "2. Prepare a valuation analysis of [TBA Seller], if requested by [TBA Seller];
>
> "3. Assist in negotiating a letter of intent either

---

1. TBA Seller, which changed its name to Opco Liquidating, LLC after selling most of its assets, is not a party to this proceeding.

with (i) JHW Greentree Capital, L.P. and Green-Leaf Capital, L.P. for the acquisition of their preferred shares held in TBA Holdings, LLC, or (ii) TBA Holdings, LLC for the acquisition of its sole membership interest in [TBA Seller];

"4. Prepare Confidential Materials for distribution and presentation to potential participants in a Transaction (collectively, 'Prospective Investors'), which shall be reviewed for accuracy and completeness, and approved in writing, by [TBA Seller];

"5. Assist in identifying and screening Prospective Investors and prepare a list of such Prospective Investors;

"6. Assist in soliciting and evaluating proposals from Prospective Investors, structuring a transaction and negotiating a definitive agreement for the Transaction;

"7. Assist in making presentations regarding any proposed Transaction to the Board of Directors of [TBA Seller]; and

"8. Assist in creating management presentations and the data room."

In consideration of these services, Fidus was to receive an "Advisory Fee" of $50,000 and, in the event a "Transaction" within the meaning of the agreement were consummated during its term or within one year thereafter (subject to specified conditions), a "Transaction Fee" of $500,000 (against which the Advisory Fee would be credited).[2]

Fidus did not succeed in finding a transaction partner for TBA Seller. According to its chairman, Fidus "contacted and managed discussions with more than 30 prospective partners, and distributed confidential marketing material to approximately 25 prospective partners." In July 2012, two prospective transaction partners that Fidus had located (Cognitive Capital Partners and Eastwood Capital Partners) signed a preliminary letter of intent for a possible acquisition of TBA Seller's assets. This deal never came to fruition, however, because Cognitive and Eastwood were unable to provide sufficient new invest-

---

**2.** It is undisputed that TBA Seller timely paid Fidus the $50,000 Advisory Fee months before the sale of TBA Seller's assets that gives rise to the present dispute.

ment in TBA Seller to persuade TBA Seller's primary lender, Webster Bank, to agree to renegotiate TBA Seller's credit agreement.

In August 2012, Cognitive and Eastwood terminated their negotiations with TBA Seller. At that point, the company was effectively insolvent—bereft of cash and millions of dollars in debt to Webster Bank, with payments coming due that the company could not make. Facing this dire situation, TBA Seller's CEO, Robert Geddes, made efforts of his own to find new investors to save the business. Ultimately, two finance companies that Geddes had located (SLC Capital and Post Capital) agreed to purchase the bulk of TBA Seller's assets through a newly formed entity now named TBA Global, LLC (TBA Buyer), which is the petitioner in this proceeding.[3]

TBA Seller and TBA Buyer entered into an asset purchase agreement dated November 7, 2012 (the APA), under which TBA Buyer acquired TBA Seller's assets (subject to specified exceptions, as more fully discussed below) in exchange for: (1) the assumption of TBA Seller's liabilities (subject, again, to specified exceptions, as more fully discussed below); (2) a cash payment of $20,000, most of which was distributed to the United States Small Business Administration (SBA) as the receiver of the largest shareholder of TBA Seller's corporate parent; and (3) a further cash payment of $100,000 to the SBA to reimburse it for its expenses relating to the future winding up of TBA Seller. Upon the closing, TBA Buyer's owners (SLC Capital, Post Capital and a handful of individuals) invested $4.265 million in the business. This infusion of new capital ($4 million of which came from SLC and Post) enabled the company to refinance its debt to Webster Bank and to continue operations.

Although most of the assets and liabilities of TBA Seller were transferred to TBA Buyer pursuant to the APA, the agreement specified particular assets and liabilities to be retained by TBA Seller. As relevant here, two separate sections of the APA expressly exclude from the assets (§ 1.2 [c]) and liabilities

---

3. It appears from the record that TBA Buyer's original name was TBA Global Events, LLC. We note that, in addition to TBA Seller and TBA Buyer, several affiliated entities of each of them were also parties to the asset purchase agreement. To simplify our discussion, we restrict our attention to TBA Seller and TBA Buyer, since this proceeding is concerned only with the question of whether TBA Seller's obligations under the Fidus/Seller agreement were assumed by, or otherwise passed to, TBA Buyer.

(§ 1.3 [d]) that were transferred to TBA Buyer *"brokerage or finders' fees* or agents' commissions *or other similar payments"* (emphasis added).[4] Further, section 3.14 of the APA expressly provides that TBA Seller "shall pay the fees, costs and expenses of [TBA Seller] incurred in connection with this Agreement and the transactions contemplated by this Agreement, *including the fees, costs and expenses of [its] financial advisors,* accountants and counsel" (emphasis added).[5]

---

4. Section 1.2 of the APA provides in pertinent part:
"1.2 Excluded Assets. Notwithstanding anything to the contrary set forth in this Agreement, the Assets [being acquired by TBA Buyer] will not include the following assets, properties and rights of [TBA Seller] (collectively, the 'Excluded Assets'): . . .
"(c) all contracts and other agreements relating to brokerage or finders' fees or agents' commissions or other similar payments."
Section 1.3 of the APA provides in pertinent part:
"1.3 Assumed Liabilities.
"(a) Effective as of the close of business on the Closing Date, Global Events [an affiliate of TBA Buyer] will assume and agree to pay, discharge or perform when due, as appropriate, only those liabilities identified on Schedule 1.3(a) hereto (the 'Global Assumed Liabilities').
"(b) Effective as of the close of business on the Closing Date, Global Marketing [an affiliate of TBA Buyer] will assume and agree to pay, discharge or perform when due, as appropriate, only those liabilities identified on Schedule 1.3(b) hereto (the 'Canadian Assumed Liabilities').
"(c) Effective as of the close of business on the Closing Date, [TBA Buyer] will assume and agree to pay, discharge or perform when due, as appropriate, only those liabilities identified on Schedule 1.3(c) hereto (the 'Remaining Assumed Liabilities' and, collectively with the Global Assumed Liabilities and the Canadian Assumed Liabilities, the 'Assumed Liabilities').
"(d) ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING, EXCEPT FOR THE ASSUMED LIABILITIES DESCRIBED IN SECTIONS 1.3(a), 1.3(b) AND 1.3(c), THE PURCHASERS [defined to include TBA Buyer] SHALL NOT AND THE PURCHASERS DO NOT ASSUME ANY LIABILITIES OR OBLIGATIONS (FIXED OR CONTINGENT, KNOWN OR UNKNOWN, MATURED OR UNMATURED) OF THE SELLERS [defined to include TBA Seller], INCLUDING, WITHOUT LIMITATION (1) BROKERAGE OR FINDERS' FEES OR AGENTS' COMMISSIONS OR OTHER SIMILAR PAYMENTS."
5. Section 3.14 of the APA provides in full:
"3.14 Transaction Costs. Except to the extent comprising a portion of the Assumed Liabilities described in Sections 1.3(a), 1.3(b) and 1.3(c), (a) the Purchasers [defined to include TBA Buyer] shall pay their own fees, costs and expenses incurred in connection with this Agreement and the transactions contem-

After TBA Buyer purchased TBA Seller's assets, Fidus asked TBA Buyer to pay it $450,000 as the outstanding balance (after giving credit for TBA Seller's initial $50,000 payment) of the Transaction Fee provided by the Fidus/Seller agreement, to which Fidus claimed to have become entitled upon the closing of the transaction.[6] TBA Buyer declined, taking the position that, under the APA, it had not assumed TBA Seller's liability for any amounts due Fidus under the Fidus/Seller agreement. Fidus subsequently served upon TBA Buyer a demand for arbitration of its claim pursuant to the Fidus/Seller agreement's arbitration clause.[7]

In response to the demand for arbitration, TBA Buyer commenced this proceeding under article 75 of the CPLR, seeking a permanent stay of the arbitration pursuant to CPLR 7503 (b). Fidus opposed TBA Buyer's petition. Supreme Court denied the petition, essentially accepting Fidus's arguments that, under the APA, TBA Buyer had assumed TBA Seller's liability to Fidus for any Transaction Fee or expense reimbursement due under the Fidus/Seller agreement. The court did not reach Fidus's alternative arguments that liability under the Fidus/ Seller agreement could be imposed on TBA Buyer pursuant to principles of successor liability even in the absence of an express assumption. As noted above, upon TBA Buyer's appeal, we reverse.[8]

We begin our analysis with a review of certain basic principles. "Although arbitration is favored as a matter of

---

plated by this Agreement, including the fees, costs and expenses of their financial advisors, accountants and counsel, and (b) the Sellers [defined to include TBA Seller] shall pay the fees, costs and expenses of the Sellers incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees, costs and expenses of their financial advisors, accountants and counsel."

6. Fidus also requested reimbursement pursuant to the Fidus/Seller agreement of $6,816.67 in out-of-pocket expenses that Fidus allegedly incurred in performing under the agreement.

7. The Fidus/Seller agreement provides that "any claim or controversy arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association," with such arbitration to take place in New York.

8. Supreme Court did grant the petition insofar as it was brought by TBA Buyer's direct parent, petitioner TBA Global Holdings, Inc., which also had been named as a respondent in Fidus's arbitration demand. Fidus has not taken an appeal from the stay of the arbitration as against TBA Global Holdings, Inc.

public policy, equally important is the policy that seeks to avoid the unintentional waiver of the benefits and safeguards which a court of law may provide in resolving disputes" (*TNS Holdings v MKI Sec. Corp.*, 92 NY2d 335, 339 [1998] [citation omitted]). Thus, "the obligation to arbitrate remains a creature of contract," and "[w]here, as here, the parties dispute not the scope of an arbitration clause but whether an obligation to arbitrate exists, the general presumption in favor of arbitration does not apply" (*Oxbow Calcining USA Inc. v American Indus. Partners*, 96 AD3d 646, 648-649 [1st Dept 2012] [internal quotation marks and ellipsis omitted]). Here, it is undisputed that the Fidus/Seller agreement, which TBA Buyer never signed, contains an arbitration clause covering the subject matter of the instant dispute. What is in dispute is whether the APA, which TBA Buyer did sign, provides for TBA Buyer's assumption of TBA Seller's obligations under the Fidus/Seller agreement, including the obligation to arbitrate thereunder. To that question we now turn.

■ Section 3.14 of the APA establishes, as a matter of law, that TBA Buyer did not assume TBA Seller's liability to Fidus, if any, under the Fidus/Seller agreement. The provision of section 3.14 that TBA Seller will pay the fees of its own "financial advisors," among other professionals, "incurred in connection with . . . the transactions contemplated by this Agreement," plainly excludes any liability to Fidus from the liabilities transferred to TBA Buyer, inasmuch as the Fidus/Seller agreement expressly characterizes Fidus as TBA Seller's "exclusive financial advisor" in connection with any contemplated transaction. While Fidus, seeking to avoid the effect of section 3.14, points to that section's exclusion from the scope of the liabilities retained by TBA Seller those "comprising a portion of the Assumed Liabilities described in Sections 1.3(a), 1.3(b) and 1.3(c)," the schedules of assumed liabilities referred to in those subsections (quoted in n 5 above) do not mention the Fidus/Seller agreement in particular or financial advisors' fees in general.[9]

Contrary to Fidus's further argument, TBA Buyer is not taking inconsistent positions in arguing that any fee that Fidus might have earned under the Fidus/Seller agreement falls within the scope of section 3.14 of the APA, which covers "the

---

9. Sections 1.3 (a) and (b), it should be noted, refer to liabilities being assumed by entities other than TBA Buyer. Accordingly, sections 1.3 (a) and (b), and schedules 1.3 (a) and (b) to which they refer, have no bearing on this proceeding.

fees, costs and expenses of [TBA Seller] incurred in connection with this Agreement and the transactions contemplated by this Agreement." Fidus's claim of entitlement to a Transaction Fee under the Fidus/Seller agreement is necessarily based on the position that the consummation of the deal with TBA Buyer triggered its right to payment of the fee, which, if true, would place the fee within the scope of section 3.14 of the APA. TBA Buyer is not taking a position in this proceeding on whether Fidus is entitled to a fee from TBA Seller under the terms of the Fidus/Seller agreement. Rather, TBA Buyer argues only that, under the APA, it did not assume liability for any such fee, assuming that it was earned.

Echoing Fidus, the dissent focuses on section 1.3 (c) of the APA, which provides for TBA Buyer's assumption of "only those liabilities identified on Schedule 1.3(c) hereto," which liabilities, as previously noted, are excluded by section 3.14 from the scope of the "Transaction Costs" retained by TBA Seller. Schedule 1.3 (c) to the APA, to which section 1.3 (c) refers, comprises more than four full pages and refers by name to scores of parties with which TBA Seller had contracted. Nowhere in schedule 1.3 (c), however, can one find any specific reference to Fidus or the Fidus/Seller agreement, although a potential liability of $450,000—the amount of the Transaction Fee to which Fidus claims to be entitled—would presumably have warranted mention by name in a deal involving total investment by TBA Buyer of only about $4 million. While schedule 1.3 (c) does set forth a few descriptions of categories of contracts to be assumed by TBA Buyer, the only categorical reference into which the dissent argues that the Fidus/Seller agreement can be fitted is this one: "All compensation and other benefits and amounts payable to employees and *contractors* of the Remaining Asset Sellers accruing since October 31, 2012" (emphasis added).[10] It is the dissent's view that, because Fidus could be described as a "contractor" of TBA Seller, any fee TBA Seller owed under the Fidus/Seller agreement that accrued after October 31, 2012, was excluded from the "Transaction Costs" retained by the TBA Seller pursuant to section 3.14.

The dissent's reasoning is untenable. Given that the word "contractor" means "[a] party to a contract" (Black's Law Dictionary 400 [10th ed 2014]), the dissent's approach would exclude *all* contractual liabilities from the obligations retained

---

**10.** The APA defines the term "Remaining Asset Sellers" to include TBA Seller.

by TBA Seller, which, contrary to the plain intent of the parties, would render nugatory the provisions of the APA that designate specific contractual obligations to be retained by TBA Seller. Mindful of the directive of the Court of Appeals to "avoid an interpretation that would leave contractual clauses meaningless" (*Two Guys from Harrison-N.Y. v S.F.R. Realty Assoc.*, 63 NY2d 396, 403 [1984]), we follow the longstanding rule that, where "there [is] an inconsistency between a specific provision and a general provision of a contract . . . , the specific provision controls" (*Muzak Corp. v Hotel Taft Corp.*, 1 NY2d 42, 46 [1956]; *see also e.g. Bank of Tokyo-Mitsubishi, Ltd., N.Y. Branch v Kvaerner a.s.*, 243 AD2d 1, 8 [1st Dept 1998]; Restatement [Second] of Contracts § 203 [c]; 22 NY Jur 2d, Contracts § 251; 2B NY PJI2d 4:1 at 47 [2015]; Glen Banks, New York Contract Law § 9:9 at 343 [28 West's NY Prac Series 2006]; 2 Farnsworth on Contracts § 7.11 at 297-298 [3d ed 2004]). Thus, the terms of the APA providing that TBA Seller would retain, post-closing, particular kinds of contractual obligations—including, as set forth in section 3.14, liability for "the fees, costs and expenses of [its] financial advisors"—take precedence over schedule 1.3's general reference to "compensation . . . payable to . . . contractors."

The conclusion that TBA Buyer never assumed TBA Seller's obligations under the Fidus/Seller agreement is compelled, as a matter of law, by (1) the Fidus/Seller agreement's express provision that TBA Seller was retaining Fidus as its "exclusive *financial advisor*" (emphasis added) in connection with the contemplated sale of the business and (2) the specific provision of section 3.14 of the APA that TBA Seller, and *not* TBA Buyer, would "pay . . . the fees, costs and expenses of [its] *financial advisors*" (emphasis added) incurred in contemplation of the sale of the business. Again, the specific reference to fees of "financial advisors" in section 3.14 of the APA controls over schedule 1.3's general reference to amounts "payable to . . . contractors." Thus, to decide whether TBA Buyer assumed this liability pursuant to the APA, there is no need to determine whether any fee that TBA Seller might owe Fidus under the Fidus/Seller agreement was also excluded from the transfer to TBA Buyer as a "brokerage or finder['s] fee[ ] . . . or other similar payment[ ]" within the meaning of sections 1.2 (c) and 1.3 (d) of the APA. Whether or not a fee owed to Fidus qualifies as a "brokerage or finder['s] fee[ ] . . . or other similar payment[ ]," such a fee plainly constitutes, under the express terms

of the Fidus/Seller agreement, the fee of a "financial advisor" and, for that reason alone, is unquestionably excluded from the transfer under section 3.14 of the APA.

Although, as just noted, we need not reach this issue to decide this appeal, we also reject Fidus's contention, adopted by the dissent, that the fee Fidus seeks to recover under the Fidus/Seller agreement is not a "brokerage or finder['s] fee[ ] . . . or other similar payment[ ]" within the meaning of sections 1.2 (c) and 1.3 (d) of the APA. On the contrary, this fee, if owed, is plainly one for a broker's or finder's services or, at a minimum, services of a nature "similar" to those of a broker or finder.

Fidus, like a broker or finder, was hired by TBA Seller to identify another party with which TBA Seller could engage in a prospective business transaction (*see Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158, 163 [1993] [noting that a "finder is required to introduce and bring the parties together, without any obligation or power to negotiate the transaction, in order to earn the finder's fee," and that a broker, "(w)hile . . . perform(ing) that same introduction task, . . . must ordinarily also bring the parties to an agreement"]). It is of no moment that the advisory services Fidus agreed to provide to TBA Seller went (as stated by the dissent) "well beyond the services of a broker or finder."[11] Certainly, it is not unusual for a broker to offer financial advice in addition to brokerage services, and that a broker or finder agrees to provide services beyond the dictionary definitions of those roles does not exclude the service provider from the category of brokers or finders.[12]

Fidus and the dissent fare no better when, taking the opposite approach, they argue that Fidus's fee could not fall within the category of "brokerage or finders' fees" because the conditions upon Fidus's entitlement to a Transaction Fee under

---

11. Of course, that Fidus agreed to provide extensive financial advice under the Fidus/Seller agreement—which, again, expressly described Fidus as TBA Seller's "exclusive financial advisor"—only highlights the exclusion from the transfer of any fee owed Fidus as a "fee[ ] . . . of [a] financial advisor[ ]" under section 3.14 of the APA, as previously discussed.

12. Contrary to the dissent's assertion, nowhere do we suggest that Fidus's fee should be "bifurcat[ed]" between a portion allocable to liabilities retained by TBA Seller and a portion allocable to liabilities transferred to TBA Buyer. Under the Fidus/Seller agreement, Fidus earned one fee (which, upon the satisfaction of certain conditions, would increase from $50,000 to $500,000), and liability for that fee either was or was not transferred to TBA Buyer pursuant to the APA.

the Fidus/Seller agreement were less stringent than the typical conditions upon the earning of a broker's or finder's fee. With regard to brokers, for example, the dissent purports to contrast the Transaction Fee under the Fidus/Seller agreement with a brokerage fee on the ground that the former "was not conditioned on Fidus's continued involvement in any ensuing negotiations or in the completion of the sale." Typically, however, a broker having an exclusive engagement to arrange a transaction for the client—unlike the broker in the case cited by the dissent (*Greene v Hellman*, 51 NY2d 197 [1980])—will be entitled to compensation for any transaction ultimately consummated, whether or not that broker was the procuring cause of the deal (*see Sioni & Partners, LLC v Vaak Props., LLC*, 93 AD3d 414, 417 [1st Dept 2012]; *Rachmani Corp. v 9 E. 96th St. Apt. Corp.*, 211 AD2d 262, 268 [1st Dept 1995]). Here, the Fidus/Seller agreement expressly designated Fidus as TBA Seller's *"exclusive* financial advisor" for the contemplated transaction (emphasis added), which readily explains why Fidus's entitlement to a Transaction Fee was not conditioned on its having been the procuring cause of a deal.

The exclusivity of Fidus's role also explains why the observation in Fidus's brief that the Fidus/Seller agreement "did not require Fidus finding or introducing [TBA Seller] to a purchaser" does not mean that Fidus cannot be considered to have played the role of a finder (albeit unsuccessfully). Indeed, as previously noted, according to its chairman's affidavit, Fidus "contacted and managed discussion with more than 30 prospective partners [on behalf of TBA Seller], and distributed confidential marketing material to approximately 25 prospective partners." Because of the exclusivity of Fidus's role, however, its entitlement to a Transaction Fee from TBA Seller did not depend on the success of its efforts as a finder. Thus, Fidus, based on the above-quoted terms of the Fidus/Seller agreement and on its own admissions, could legitimately be characterized as having acted as either a broker or a finder in its engagement for Fidus.

The dissent—making an argument that Fidus itself has not made—further contends that the fee under the Fidus/Seller agreement cannot be a "brokerage" fee under sections 1.2 (c) and 1.3 (d) of the APA because, while a "broker is a fiduciary with a duty of loyalty and an obligation to act in the best interests of the principal," the Fidus/Seller agreement "expressly stated . . . that Fidus was being retained to provide

certain financial advisory services as an 'independent contractor (and not in any fiduciary or agency capacity).' " Even if the dissent is correct in arguing that Fidus's disclaimer of any fiduciary duty means that it could not be considered a broker, the parties' agreement that Fidus was not a fiduciary is in no way inconsistent with Fidus's having been a finder. The Court of Appeals has expressly held that a finder generally does *not* owe a fiduciary duty to the principal (*see Northeast Gen. Corp.*, 82 NY2d at 160 ["Unless the particular agreement establishes a relationship of trust, one will not spring from a finder's contract in and of itself"]; *id.* at 163 ["A broker in New York, *unlike a finder*, . . . carries a defined fiduciary duty to act in the best and more involved interests of the principal" (emphasis added)]; *see also Stiefvater Real Estate, Inc. v Himbaugh*, 42 AD3d 525, 526 [2d Dept 2007] [contrasting "the plaintiff's limited role as a finder" to that of "an agent acting in a fiduciary capacity"]; *Trump v Corcoran Group*, 240 AD2d 159, 159 [1st Dept 1997] [because "the only duty that defendants owed plaintiff was to introduce him to certain investors," the fact that their "compensation would be payable only if an investment were made . . . did not transform them into fiduciaries"]).

In any event, regardless of technical definitions, sections 1.2 (c) and 1.3 (d) of the APA exclude from the scope of the transfer, not only the fees of brokers and finders, but also "other similar payments." To avoid rendering this contractual language meaningless, the exclusion should be construed to reach the fees of contractors who, even if falling outside the scope of the respective technical definitions of brokers and finders, were engaged to perform tasks typically performed by brokers and finders, namely, facilitating a business transaction between the client and a third party not yet determined at the time of the engagement. Beyond question, this is what TBA Seller hired Fidus to do.

We see no grounds for the dissent's faulting of TBA Buyer for purportedly failing to make "clear" in the APA that it was not assuming TBA Seller's obligations under the Fidus/Seller agreement. No doubt that TBA Buyer wishes, in retrospect, that the Fidus/Seller agreement had been excluded by name from the assets and liabilities transferred pursuant to the APA, especially given that Fidus's $450,000 claim is more than 10% of the total investment of approximately $4 million TBA Buyer made in connection with its purchase of the operating assets of

a failing enterprise. The absence of a reference by name to the Fidus/Seller agreement does not, however, change the fact that Fidus's fee under that agreement (assuming that it was earned) plainly falls within the scope of the APA's express exclusions from the liabilities assumed by TBA Buyer of (1) fees owed to "financial advisors" that TBA Seller "incurred in connection with . . . the transactions contemplated by [the APA]" and (2) "brokerage or finders' fees . . . or other similar payments." Whether or not a different approach in drafting the APA arguably would have avoided the dispute with which we are presented, it is the task of this Court to construe accurately the contractual language actually used in that agreement.[13]

In opposing the petition to stay the arbitration, Fidus also argued that, even if TBA Buyer did not assume TBA Seller's obligations to Fidus under the terms of the APA, TBA Buyer could nonetheless be compelled to submit to arbitration under certain alternative theories, including successor liability and estoppel. Supreme Court, having denied the petition based on its erroneous reading of the APA, did not reach these alternative arguments. On appeal, Fidus argues that, even if we reject its arguments under the APA, the order appealed from should be affirmed based on either successor liability or estoppel. We find that, on this record, Fidus, as the proponent of arbitration, has not sustained its burden of proving that either of these theories affords grounds for deeming TBA Buyer bound by the Fidus/Seller agreement and its arbitration clause (*see Matter of Katz v Alpert*, 68 AD3d 640, 641 [1st Dept 2009], *lv denied* 14 NY3d 705 [2010] [in a proceeding seeking a stay of arbitration, the proponents of arbitration "failed to meet their burden to show that petitioners had agreed to arbitrate"]; *Eiseman Levine Lehrhaupt & Kakoyiannis, P.C. v Torino Jewelers, Ltd.*, 44 AD3d 581, 583 [1st Dept 2007] ["The proponent of arbitration has the burden of demonstrating that the parties agreed to arbitrate"]).[14]

■ We address first Fidus's argument that TBA Buyer succeeded to TBA Seller's obligations under the Fidus/Seller agree-

13. We observe that, even if the interpretation of the APA by the dissent and Fidus were plausible, such plausibility would at most establish that the APA is ambiguous, given that the plausibility of TBA Buyer's more natural reading of APA's exclusion provisions is undeniable. If such an ambiguity did exist, a remand for a hearing for the reception of parol evidence to resolve the ambiguity, rather than the affirmance of the dismissal of the petition called for by the dissent, would be warranted.

14. Before Supreme Court, Fidus also advocated requiring TBA Buyer to arbitrate based on a theory of fraudulent conveyance. On appeal, however,

ment under the doctrine of de facto merger. While the general rule is that, absent a merger or consolidation, an entity purchasing the assets of another entity does not thereby acquire liabilities of the seller not expressly transferred in the sale (*see Schumacher v Richards Shear Co.*, 59 NY2d 239, 244-245 [1983]), a purchase-of-assets transaction may be deemed to constitute a de facto merger between seller and buyer, even if not formally structured as such, under certain conditions (*see Matter of New York City Asbestos Litig.*, 15 AD3d 254, 256 [1st Dept 2005]). We have recognized, however, that "the essence of a merger" (*id.* [internal quotation marks omitted]) is the element of continuity of ownership, which

> "exists where the shareholders of the predecessor corporation become direct or indirect shareholders of the successor corporation as the result of the successor's purchase of the predecessor's assets, as occurs in a stock-for-assets transaction. Stated otherwise, continuity of ownership describes a situation where the parties to the transaction 'become owners together of what formerly belonged to each' " (*id.*, quoting *Cargo Partner AG v Albatrans, Inc.*, 352 F3d 41, 47 [2d Cir 2003]).

Although other factors may be considered in determining whether a de facto merger has occurred (*New York City Asbestos Litig.*, 15 AD3d at 256), we are unaware of any decision of a New York appellate court making or affirming a finding of de facto merger in the absence of continuity of ownership. Moreover, the Second Circuit, applying New York law, has announced that it is "confident that the doctrine of de facto merger in New York does not make a corporation that purchases assets liable for the seller's contract debts absent continuity of ownership" (*Cargo Partner*, 352 F3d at 46).[15]

Fidus does not urge affirmance based on a fraudulent conveyance theory. Accordingly, that theory is not discussed here.

**15.** Notably, the Second Circuit has also addressed the question of whether, under New York's doctrine of de facto merger, the tort liability of a defunct corporation may be imposed on the purchaser of the defunct corporation's assets in the absence of evidence of continuity of ownership. In a decision by then-Circuit Judge Sotomayor, the Second Circuit held that the New York Court of Appeals would not find even "the public policy considerations at issue in tort cases sufficient to justify the departure from the common-law standards that would be necessary to find the existence of a de facto merger in the absence of any evidence of continuing ownership" (*New York v National Serv. Indus., Inc.*, 460 F3d 201, 215 [2d Cir 2006]).

We agree with the Second Circuit that, under New York law, continuity of ownership is "the touchstone of the [de facto merger] concept" and "thus a necessary predicate to a finding of a de facto merger" (*National Serv. Indus.*, 460 F3d at 212). The purpose of requiring continuity of ownership is "to identify situations where the shareholders of a seller corporation retain some ownership interest in their assets after cleansing those assets of liability" (*id.* at 211 [internal quotation marks omitted]). Stated otherwise, "[t]he fact that the seller's owners retain their interest in the supposedly sold assets (through their ownership interest in the purchaser) *is* the 'substance' which makes the transaction inequitable" (*Cargo Partner AG v Albatrans Inc.*, 207 F Supp 2d 86, 104 [SD NY 2002], *affd* 352 F3d 41 [2d Cir 2003]). By contrast, where a

> "buyer pays a bona fide, arms-length price for the assets, there is no unfairness to creditors in . . . limiting recovery to the proceeds of the sale—cash or other consideration roughly equal to the value of the purchased assets would take the place of the purchased assets as a resource for satisfying the seller's debts" (*Cargo Partner*, 352 F3d at 45).

Thus, "allowing creditors to collect against the purchasers of insolvent debtors' assets would give the creditors a windfall by increasing the funds available compared to what would have been available if no sale had taken place" (*id.* [internal quotation marks omitted]).

In this case, there is no continuity of ownership between TBA Seller and TBA Buyer because, as the record establishes (and Fidus does not dispute), none of TBA Seller's owners acquired a direct or indirect interest in TBA Buyer (and thus in the transferred assets) as a result of the asset purchase transaction (*see New York City Asbestos Litig.*, 15 AD3d at 256 [continuity of ownership was absent because the buyer "paid for (the seller's) assets with cash, not with its own stock"]).[16] Indeed, only one owner of an interest in TBA Seller received

---

16. While two members (Robert Geddes and Paula Balzer) of the limited liability company that directly owns TBA Seller (TBA Holdings, LLC) now own shares of TBA Buyer's direct corporate parent (TBA Global Holdings, Inc.), this does not constitute continuity of ownership. Geddes and Balzer, who still hold their interests in TBA Holdings, LLC, purchased their shares in TBA Buyer's parent with new and separate consideration, and did not acquire those shares as an element of the asset purchase transaction between TBA Seller and TBA Buyer (*see Perceptron, Inc. v Silicon Video, Inc.*, 2011 WL 4595003, *9, 2011 US Dist LEXIS 112523, *26 [ND NY, Sept. 30, 2011,

anything for that interest as a result of the asset purchase, namely, the SBA, which received $20,000 for an $18 million investment. Under these circumstances, to allow Fidus to hold TBA Buyer as bound by the Fidus/Seller agreement, in spite of the express exclusion of that contract from the liabilities transferred pursuant to the APA, would confer an unjustifiable windfall on Fidus.[17]

Finally, TBA Buyer is not estopped to avoid arbitration under the Fidus/Seller agreement, to which TBA Buyer is not a party. While "a nonsignatory may be estopped from avoiding arbitration where it knowingly accepted the benefits of an agreement with an arbitration clause" (*Oxbow Calcining*, 96 AD3d at 649 [internal quotation marks omitted]), Fidus has not shown that TBA Buyer received any benefit, much less a "direct" benefit required to support an estoppel claim (*id.*), from the Fidus/ Seller agreement. Fidus did not bring the opportunity to acquire TBA Seller's business to the attention of the companies and individuals who ultimately formed TBA Buyer and caused it to enter into the transaction. Further, it is undisputed that none of the controlling shareholders of TBA Buyer's corporate parent had any form of communication with Fidus before the transaction took place. Neither has Fidus demonstrated that the structure of the asset purchase by TBA Buyer was "appropriated" from the structure Fidus developed for the unconsummated deal with Cognitive and Eastwood. Also

No. 5:06-CV-0412 (GTS/DEP)] [continuity of ownership was not present, in spite of the seller and buyer having certain shareholders in common, because "ownership of the successor was (not) part of the agreement to transfer assets from the predecessor to the successor"]; *Desclafani v Pave-Mark Corp.*, 2008 WL 3914881, *5, 2008 US Dist LEXIS 64672, *20 [SD NY, Aug. 22, 2008, No. 07-Civ-4639 (HBP)] [although the majority owner of the seller corporation was also an owner of the buyer corporation, continuity of ownership was absent because there was no showing that the stockholder received his ownership interest in the buyer corporation "as part of the asset purchase"]).

17. Fidus also argues for affirmance on the ground that TBA Buyer is a "mere continuation" of TBA Seller (*see Schumacher*, 59 NY2d at 245). To the extent that the "mere continuation" theory is distinct from the de facto merger doctrine (*but see Cargo Partner*, 352 F3d at 45 n 3 [noting the view that "the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception"]), we find that TBA Buyer cannot be considered a "mere continuation" of TBA Seller because TBA Seller survived the asset purchase transaction and continues to exist (*see Schumacher*, 59 NY2d at 245 ["Since Richards Shear survived the instant purchase agreement as a distinct, albeit meager, entity, the Appellate Division properly concluded that Logemann cannot be considered a mere continuation of Richards Shear"]).

unavailing is Fidus's attempt to found an estoppel on the contention that TBA Seller and TBA Buyer acted "concertedly," as there is no evidence that the two entities acted in concert to exploit Fidus, to induce Fidus to do anything, or to deprive Fidus of any benefit that it otherwise would have received.

Accordingly, the order of the Supreme Court, New York County (Melvin L. Schweitzer, J.), entered on or about June 13, 2014, which, to the extent appealed from, denied the petition to permanently stay arbitration commenced by respondent as against petitioner TBA Global, LLC, should be reversed, on the law, with costs, and the petition granted.

MANZANET-DANIELS, J. (dissenting). I would affirm the order denying petitioner's motion to stay the arbitration. In my view, the motion court correctly found that petitioner is bound to arbitrate disputes arising out of the Fidus agreement, the Fidus agreement being one of the liabilities transferred pursuant to the asset purchase agreement (APA). The majority's conclusion that payments pursuant to the Fidus agreement constitute a "finder's fee" outside of the scope of the transferred liabilities is contrary to the law and the plain language of the agreement itself.

Petitioner agreed to purchase all of TBA Seller's assets other than the "Excluded Assets," which was defined in section 1.2 to include "any equity securities of any of the Sellers" and "all contracts and other agreements relating to brokerage or finders' fees or agents' commissions or other similar payments." Section 1.3 (c) of the APA states:

> "Effective as of the close of business on the Closing Date, TBAGE will assume and agree to pay, discharge or perform when due, as appropriate, only those liabilities identified on Schedule 1.3(c) hereto (the 'Remaining Assumed Liabilities' and, collectively with the Global Assumed Liabilities and the Canadian Assumed Liabilities, the 'Assumed Liabilities')."

"TBAGE" is defined as the entity that became petitioner herein. "Remaining Asset Sellers" is defined as including the TBA Global entity that executed the Fidus agreement. One of the liabilities identified in schedule 1.3 (c) is "[a]ll compensation and other benefits and amounts payable to employees and contractors of the Remaining Asset Sellers accruing since October 31, 2012."

The Fidus agreement expressly acknowledges "that Fidus is providing services hereunder as an independent contractor (and not in any fiduciary or agency capacity)." The amount payable to Fidus as one of TBA Global's "contractors" was accordingly a liability transferred under the APA. Petitioner's failure to limit the definition of "contractor" in the APA is all the more glaring given that the parties to the agreement were well aware that TBA Global had hired Fidus pursuant to a written agreement, which, as stated, identified Fidus as an "independent contractor."

Paragraph A of the Fidus agreement outlines all of the services Fidus agreed to provide, including many that go well beyond the services of a broker or finder. Fidus agreed, inter alia, to analyze the business, properties and operations of TBA Seller; prepare a valuation analysis of TBA Seller, if requested; assist in negotiations with TBA Seller's largest investor and its primary lender; prepare confidential materials for distribution and presentation to prospective investors; assist in structuring a transaction and negotiating a definitive agreement; and assist in creating management presentations and a data room.

Paragraph B, entitled "Fees and Expenses," states that "[i]n connection with the services described above, the Company shall pay to Fidus the following compensation." This language clearly indicates that the compensation to be paid Fidus was consideration for *all* of the services Fidus was to provide. Nothing in the language of the agreement allows for bifurcation of fees and services in the manner suggested by the majority. Further, nothing in the definition of "Advisory Fee" or "Transaction Fee" suggests that either was to be paid as specific consideration for separate services to be provided by Fidus.

The transaction fee is not a "broker's fee," as even the majority appears to recognize. "[A] . . . broker is a fiduciary with a duty of loyalty and an obligation to act in the best interests of the principal" (*Sonnenschein v Douglas Elliman-Gibbons & Ives*, 96 NY2d 369, 374 [2001] [internal quotation marks omitted]). The Fidus agreement expressly stated, however, that Fidus was being retained to provide certain financial advisory services as an "independent contractor (and not in any fiduciary or agency capacity)." Moreover, unlike a typical broker's commission, the transaction fee was not conditioned on Fidus's continued involvement in any ensuing negotiations or in the completion of the sale (*see Greene v Hellman*, 51 NY2d 197, 206 [1980]).

The transaction fee similarly does not qualify as a "finder's fee." A finder does not have any obligation or power to negotiate the transaction, and earns its fee only if there is a "continuing connection" between the finder's introduction of the business opportunity and the consummated transaction (*see Simon v Electrospace Corp.*, 28 NY2d 136, 139-142 [1971]). It is undisputed in this case that Fidus did not "find" the buyer— indeed, petitioner expressly asserts that "Fidus failed to arrange a viable transaction," and that "Fidus . . . did not introduce TBA Buyer to TBA Seller, nor was Fidus . . . involved in the transaction."

The majority's reliance on language from the "Transaction Costs" section of the APA to conclude that the Fidus agreement is outside the scope of the transferred liabilities is similarly misplaced. While section 3.14 provides that TBA Seller is to pay its own fees, costs and expenses incurred in connection with the asset sale transaction, including the "costs and expenses of [its] financial advisors," it also expressly states that it does not apply to the extent such fees, costs and expenses "compris[e] a portion of the Assumed Liabilities described in Section[ ] . . . 1.3 (c)."

Given the sophistication of the parties to the asset sale transaction, if they had intended to exclude TBA Seller's obligations under the Fidus agreement from those assumed by petitioner, they could have made such an intention clear in the words of their agreement (*see Banco Espírito Santo, S.A. v Concession Do Rodoanel Oeste S.A.*, 100 AD3d 100, 108-109 [1st Dept 2012]). For example, the APA identifies the "Service Agreement, dated as of December 1, 2011, between Oasis Outsourcing Inc. and TBA Global," as an excluded asset.

Petitioner is therefore bound to arbitrate any disputes arising out of the Fidus agreement in accordance with the broad arbitration clause providing that "any claim or controversy arising out of or relating to th[e] [Fidus] [a]greement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association."

Because I would find that petitioner is bound to arbitrate disputes arising out of the Fidus agreement, I need not address Fidus's additional arguments for holding petitioner to the agreement, including estoppel and successor liability. However, the result reached by the majority would necessitate a remand for a hearing on those issues, since they were not addressed by the court in the order on appeal.

RENWICK, MOSKOWITZ and RICHTER, JJ., concur with FRIED-MAN, J.P.; MANZANET-DANIELS, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered on or about June 13, 2014, reversed, on the law, with costs, and the petition granted.