■ FAIRWAY PRIME ESTATE MANAGEMENT, LLC, Appellant, v FIRST AMERICAN INTERNATIONAL BANK, Respondent. [952 NYS2d 524]—

In 2007, plaintiff, a developer, obtained a loan from United Commercial Bank (UCB) to purchase land located at 42-18/28 Bowne Street in Flushing, Queens, for the purpose of building a mixed residential and commercial use condominium on the property upon obtaining additional capital for the construction. On or about August 27, 2008, plaintiff received a commitment letter from defendant First American International Bank in which the bank committed to an aggregate loan of $10 million, which would include the original UCB land loan of $2.38 million, to be converted into a participation in the total $10 million, at an interest rate of prime plus 1.5%, with a minimum interest rate of 7.5%, subject to certain conditions. One of the conditions was "a satisfactory appraisal report from an appraiser acceptable to the Bank indicating the value of the 'newly built' Premises of an amount of at least $25,100,000.00 as Gross Sell Out Market Value, and $22,400,000 as Discounted Net Sell Out Value, which appraisal is reasonably satisfactory to the Bank" (emphasis omitted). Capital Appraisal Services, Inc. had provided such an appraisal.

On September 24, 2008, the New York City Council passed a zoning resolution for the area in which the subject property was located that decreased the maximum amount of buildable square footage allowed to a level below the amount plaintiff planned to use. Therefore, in October 2008, the parties agreed to extend the commitment through March 31, 2009 to allow plaintiff time to obtain a variance from the Board of Standards and Appeals (BSA).

On January 27, 2009, the BSA granted plaintiff a variance. Plaintiff immediately advised defendant that the variance had been obtained and delivered a copy of the BSA resolution to defendant. On February 23, 2009, plaintiff's lawyer sent the resolution and other documents to defendant's lawyer so that the parties could schedule a closing. However, plaintiff alleges, defendant avoided closing, instead demanding a further extension agreement authorizing it to obtain a new appraisal to replace the first appraisal, which was dated August 15, 2008.

Plaintiff's owner, Henry Zheng, asserts that on or about March 24, 2009, he met with Dick Liao, defendant's vice-president and department manager for Trade Finance and Commercial Lending. According to Zheng's affidavit, Liao told Zheng that "I [Zheng] could do things the easy way, or the hard way. He . . . sa[id] the easy way to make sure the Loan would take place would be for me to sign[ ] a document on behalf of [plaintiff], agreeing to extend the time to make the Loan . . . He . . . told me that if I did not, [defendant] would make it very difficult or impossible for the Loan to take place and I should not look forward to fighting with a bank." Zheng also asserts that Liao explained to him that defendant "was under significant pressure because of the deterioration in the credit markets," and that Liao told him "that no bank was still doing construction financing, but . . . assured [him that defendant] would go forward with [the] Loan, if [he] signed the document on behalf of [plaintiff]." Liao was aware that if Zheng did not sign the document, plaintiff and Zheng "would . . . lose millions of dollars [they] had invested toward development of the subject property." Zheng felt he had no choice but to sign the March 23, 2009 extension agreement, because otherwise he would forfeit the loan. Notably, the extension agreement provided that "[a]ll other terms and conditions remain unchanged."

On April 1, 2009, Capital Appraisal issued a "restricted" appraisal, i.e., one that "[did] not include discussions of the data, reasoning, and analysis that were used in the appraisal process," estimating that, as of April 1, 2011, the gross sellout market value of the condominium would be $25 million, and the discounted net sellout value would be $21,300,000.

In or about May 2009, plaintiff completed the foundation for the property, as requested by defendant.

Defendant never terminated the August/September 2008 commitment (as extended in October 2008 and March 2009) in the manner required by its terms. Instead, on June 10, 2009, defendant sent plaintiff a new commitment letter, bearing the same loan number as the original commitment but decreasing the amount of the loan from $10 million to $8.38 million and imposing a number of onerous new conditions that had to be met within 45 days, including an additional bank balance totaling $2,000,000 to be used for the project and the inclusion in the general contractor's contract of a personal completion guarantee. Defendant allegedly told plaintiff that the new terms were "take it or leave it." Plaintiff did not countersign and return the letter within the imposed deadline, and defendant refused to lend the funds previously agreed to.

Plaintiff sued for breach of contract and fraud, and defendant moved to dismiss the complaint. The motion court granted defendant's motion and dismissed plaintiff's amended complaint. With regard to the fraud claim, it found that the claim was duplicative of the contract claim, and as to the contract claim, it held that the pleaded facts failed to establish that plaintiff had satisfied the contract's condition precedent that an appraisal report indicate that the discounted net sellout value of the property be at least $22.4 million, in view of Capital Appraisal's second appraisal report, dated April 1, 2009, estimating that, as of April 1, 2011, the discounted net sellout value would be $21,300,000.

We agree with the motion court's dismissal of plaintiff's fraud claim. "A claim for fraudulent inducement of contract can be predicated upon an insincere promise of future performance only where the alleged false promise is collateral to the contract the parties executed; if the promise concerned the performance of the contract itself, the fraud claim is subject to dismissal as duplicative of the claim for breach of contract" (*HSH Nordbank AG v UBS AG*, 95 AD3d 185, 206 [1st Dept 2012] [emphasis omitted]).

However, we conclude that plaintiff pleaded a viable cause of action for breach of contract. Although the second appraisal's values are very slightly lower than the amounts required by the contract's condition precedent—an appraised gross sellout market value of $25 million, compared to the required valuation of $25,100,000, and a discounted net sellout value of $21,300,000, compared to the required valuation of $22,400,000—there are several reasons for finding that the appraisal does not establish the failure of a condition precedent as a matter of law.

First, the appraisal itself is subject to question, given its "restricted" nature and the appraised values' variation by less than 5% from the contract requirements. Such factors as the appraisal's margin of error and the "data, reasoning and analysis" that the appraiser used to arrive at its conclusions must be examined to determine whether reliance on those valuations is justified.

Second, "[a] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition" (*ADC Orange, Inc. v Coyote Acres, Inc.*, 7 NY3d 484, 490 [2006]). If, as plaintiff alleges, defendant delayed closing on the commitment despite plaintiff's satisfaction of all pre-conditions, including a timely appraisal within the dictated range, solely in order to avoid its contractual obligation by justifying its later insistence

on a new appraisal, then defendant may be said to have frustrated or prevented plaintiff's compliance with that condition precedent. Furthermore, since "all contracts imply a covenant of good faith and fair dealing in the course of performance" (*511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 153 [2002]), the timing and circumstances of defendant's insistence on obtaining a new appraisal may support plaintiff's claim of a breach of the implied covenant of good faith.

Even if the second appraisal alone established a failure of the condition precedent, however, defendant's moving papers failed to establish as a matter of law that it effectively terminated its loan obligation in the manner required by the contract. If it failed to effectively terminate the contract, then defendant may have remained bound by its terms (*see Maxton Bldrs. v Lo Galbo*, 68 NY2d 373 [1986]).

Because plaintiff has since found alternative financing, the question of whether specific performance is available for a contract to lend money is moot. Defendant's argument that plaintiff's damages are speculative is also refuted by the financing that plaintiff has obtained. Concur—Saxe, J.P., Sweeny, Moskowitz, Freedman and Manzanet-Daniels, JJ.