[64 NYS3d 180]

CRONOS GROUP LIMITED, Respondent, v XCOMIP, LLC, et al., Appellants.

First Department, September 19, 2017

56

## APPEARANCES OF COUNSEL

*The Tsang Law Firm, P.C.*, New York City (*Michael Tsang* of counsel), for appellants.

*Neil L. Postrygacz, Attorney at Law, P.C.*, New York City (*Yan Margolin* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.P.

This appeal presents, among other issues, the recurring question of whether the facts alleged in the complaint give rise to claims for both breach of contract and fraud. We hold that the cause of action for fraud, to the extent it is based on allegations that the defendants gave false assurances that they would perform a contractual obligation, should have been dismissed on the ground that it is duplicative of the contract claim and is not supported by allegations of specific facts giving rise to an inference that defendants did not intend to honor their assurances when they were made. Because the remaining portion of the fraud cause of action is otherwise legally insufficient, that claim should have been dismissed in its entirety, although we find that the motion to dismiss was correctly denied as to the contract claim and, in part, the account stated claim. In reaching these conclusions, we explore the issues raised by the pleading of causes of action for contract and fraud based on substantially the same set of facts.

Plaintiff Cronos Group Limited and defendant XComIP, LLC are both companies in the business of supplying wholesale telecommunications services. Defendant Jay Adams is

XComIP's managing member. Cronos and XComIP entered into a written "Reciprocal Network Carrier Services Agreement" (RNCSA), dated May 30, 2013, which, at the relevant times, governed each party's transmission of its customers' calls on the other party's network and to the other party's international premium rate numbers (IPRNs).[1] Section 1 of the RNCSA provides that "each Party will provide international telephone communication Services to the other Party on the terms and conditions set forth in the attached Schedule(s)."

Section 4 of the RNCSA, entitled "Billing and Payment," as amended as of October 2, 2014, provides for billing every seven days, with payment due within seven days of the date of the invoice, and for a charge of 1.50% per month for late payments. In addition, section 4 provides:

> "In the event that charges due are not paid in full by the Due Date, each Party shall have the right to suspend all or any portion of the Services to the other Party after giving one (1) business day's prior notice . . . until such time as the other Party has paid in full all charges then due including late charges. . . . Further, each Party reserves the right to offset the other Party's invoice for Services in an amount corresponding to any undisputed amount owed but not received by the Due Date."

Section 5 of the RNCSA, entitled "Billing Adjustments," provides, in pertinent part:

> "Any request for a billing adjustment must be made in good faith and in writing within seven (7) days of receipt of the invoice in question. Any such request shall include detailed documentation to establish the basis for any adjustment. Documentation to be provided shall include, without limitation, the country, number of minutes and/or rate that is subject to dispute and may include [call detail records] to be provided by the disputing Party in a form acceptable to the responding Party. Subject to each Party's rights under Section 26, the responding Party will determine, in its sole discre-

---

1. The complaint alleges that IPRNs are similar to 900 numbers in the United States. Thus, the caller to an IPRN incurs a premium charge upon reaching the number.

tion whether any adjustment shall be made and any such adjustments will be credited against the next periodic invoice. If the responding Party, in its sole discretion, denies the billing dispute, the disputing Party agrees to pay the disputed amount with the next scheduled remittance. . . . If a request for a billing adjustment or credit is not made in writing within this seven (7) day period, the charges are deemed valid and each Party waives its rights to any credits, offsets, or adjustments with regard to them."

Section 9 of the RNCSA, entitled "Responsibilities of the Parties," provides:

"Each Party is solely responsible for collecting its charges to its customers for services it offers them utilizing the other Party's network and for preparing and mailing invoices to these customers. The Parties will indemnify each other from all costs, expenses, claims, or actions arising from allegedly fraudulent calls carried for each other through the Services. Each Party is responsible for payment of the total invoice amount from the other Party regardless of whether its customers pay for those calls or they are allegedly fraudulent calls. However, nothing contained in this Agreement prohibits either Party from immediately taking action to prevent fraudulent calls."

Section 26 of the RNCSA provides that the agreement is "in all respects governed by the laws of the State of New York, without regard to choice of laws." Section 27 designates New York City as the venue for the resolution of any disputes arising from the RNCSA, and further provides that "[a]ttorneys [sic] and paralegal fees, expert fees and costs shall be paid to the prevailing Party."

The complaint alleges that, by email messages sent on October 22 and December 4, 2015, Cronos notified XComIP that Cronos had been informed by two of its customers (in the first case, a Portugese retail service provider; in the second, a German retail service provider) of fraudulent calls that had gone from Cronos's network to XComIP's IPRNs, thereby automatically generating charges to Cronos's account with

XComIP.[2] Cronos alleges that, in response to each of these notifications, XComIP, through Adams, promptly gave Cronos oral assurances that Cronos "would not need to compensate XComIP for these fraudulent calls." Cronos further alleges that, in reliance on these assurances, it continued to allow XComIP to transmit its customers' calls over Cronos's network, which resulted in XComIP continuing to incur charges owed to Cronos. However, on December 7, 2015, an employee of XComIP notified Cronos that XComIP would not reverse the charges for the fraudulent calls. Thereafter, until December 17, Cronos continued to demand that the charges for the fraudulent calls be annulled, while continuing to allow XComIP access to its network in response to continued alleged promises from Adams that XComIP would " 'handle' or 'deal with' the problem." Finally, on December 17, Cronos terminated XComIP's access to Cronos's services. Through that date, XComIP used the charges for the allegedly fraudulent calls, totaling $54,926.84, to offset the same amount of charges that XComIP owed to Cronos for the use of Cronos's network.

In January 2016, Cronos commenced this action against XComIP and Adams, asserting the following eight causes of action: (1) breach of contract; (2) declaratory judgment; (3) account stated; (4) fraud; (5) quantum meruit; (6) conversion; (7) tortious interference with advantageous business relations; and (8) unjust enrichment. The fraud and tortious interference claims are asserted against both XComIP and Adams; the remaining claims are asserted against XComIP only. In lieu of answering, XComIP and Adams moved to dismiss the complaint pursuant to CPLR 3211 (a) (1), (7); 3016 (b) and 3013. Supreme Court denied the motion in its entirety. XComIP and Adams have appealed.

We turn first to the cause of action for breach of contract. In support of its contract claim, Cronos alleges, in sum, that, in refusing to annul the charges for the fraudulent calls, XComIP breached its obligation to "indemnify" Cronos against the costs

**2.** The October 22 notification concerned more than 14,000 calls that were made to XComIP's IPRNs in Madagascar and the Maldives on October 20 and 21, 2015. The December 4 notification concerned 13,906 calls that were made to XComIP's IPRNs in Guinea-Bissau during the period from November 11 through November 18, 2015. In each case, the customer involved attributed the calls to unknown third-party hackers who had illegitimately gained access to the customer's network. The complaint also alleges that, in each case, Cronos notified XComIP of the fraudulent calls on the same day that Cronos received notice of the fraud from its customer.

of fraudulent calls under the above-quoted section 9 of the RNCSA. The loss alleged to have resulted from this breach of contract is XComIP's nonpayment of $54,926.84 of charges for use of Cronos's network, against which XComIP offset the charges for the fraudulent calls. In addition, the complaint alleges that XComIP refused to pay an outstanding invoice from Cronos for $34,158.40, an amount "above and beyond the $54,926.84 owed under the indemnity provision for the fraudulent calls." The breach of contract claim seeks to recover damages in the total principal amount of $89,085.24 (the sum of $54,926.84 and $34,158.40), plus the late fee under section 4 of the RNCSA, legal fees recoverable under section 27 of the RNCSA, and interest.

█ In support of its contention that Cronos's contract claim should be dismissed as legally insufficient, XComIP argues that the indemnification provision of section 9 of the RNCSA, on which Cronos relies, entitles each party to be indemnified by the other only against "claims made by third-parties [sic] arising from allegedly fraudulent calls" (as stated in XComIP's appellate brief). Cronos, on the other hand, construes section 9 to relieve each party of the obligation to pay for fraudulent calls transmitted over the other party's network. Supreme Court correctly discerned an ambiguity in section 9, in that Cronos's construction finds support in the second sentence of the section, while XComIP's construction finds support in the third sentence. Because section 9 of the RNCSA, on its face, is reasonably susceptible of more than one interpretation, the provision cannot be construed as a matter of law, the documentary evidence on which XComIP relies does not conclusively dispose of Cronos's claim, and dismissal under CPLR 3211 (a) (1) and (7) is not appropriate (see *New York Univ. v Pfizer Inc.*, 151 AD3d 42, 44 [1st Dept 2017]; *US Bank N.A. v Lightstone Holdings LLC*, 103 AD3d 458, 459 [1st Dept 2013]; *Telerep, LLC v U.S. Intl. Media, LLC*, 74 AD3d 401, 402 [1st Dept 2010]; *Fortis Fin. Servs. v Fimat Futures USA*, 290 AD2d 383, 383 [1st Dept 2002]).

XComIP also argues that the cause of action for breach of contract is barred by Cronos's failure to abide by the procedures of the above-quoted section 5 of the RNCSA, which requires that a request for a "billing adjustment" be submitted in writing, with supporting documentation, within seven days of receipt of the invoice in question. However, to the extent Cronos's construction of section 9 ultimately prevails, it is section

9, not section 5, that deals specifically with "fraudulent calls." Where there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls (*see Muzak Corp. v Hotel Taft Corp.*, 1 NY2d 42, 46 [1956]; *Matter of TBA Global, LLC v Fidus Partners, LLC*, 132 AD3d 195, 204 [1st Dept 2015]). Accordingly, the breach of contract claim cannot be dismissed based on section 5 of the RNCSA.[3]

Having established that the motion to dismiss was correctly denied as to the contract claim (a determination on which this bench is unanimous), we turn to the fraud cause of action.[4] The fraud claim has two prongs, which we will analyze separately. As previously noted, our conclusion is that neither prong should have survived the motion to dismiss.[5]

■ One prong of the fraud cause of action is based on the allegation that XComIP somehow orchestrated the fraudulent calls for which Cronos was charged.[6] The complaint fails, however, to allege any specific facts that, if true, would give rise to a reasonable inference that some connection existed between XComIP and the fraudulent calls. Cronos offers nothing but speculation to support the contention that the unidentified hackers who unlawfully gained access to the networks of Cronos's customers and originated the fraudulent calls were acting in concert with XComIP or at its behest, that XComIP otherwise had knowledge of the hackers' activity, or that XComIP had any kind of connection with the hackers. Because this prong of the fraud claim is not pleaded with the particularity required by CPLR 3016 (b), it is legally insufficient (*see Greschler v Greschler*, 51 NY2d 368, 375 [1980] ["conclusory allegations" do not satisfy CPLR 3016 (b)]; *cf. Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486, 493-494 [2008] [CPLR 3016 (b) was satisfied where, from the facts alleged, a factfinder could "rea-

---

3. For the same reason, also unavailing is XComIP's reliance on the provision of section 5 that the disposition of a request for a billing adjustment is committed to the "sole discretion" of the "responding Party."

4. The remaining causes of action will be addressed at the end of this opinion.

5. As previously noted, the fraud cause of action is asserted against both XComIP and Adams. In discussing the fraud claim, unless otherwise indicated, we use the name "XComIP" to refer to both defendants collectively.

6. Specifically, the complaint alleges, "Upon [unspecified] information and belief," that XComIP "authorized, procured or otherwise caused the unknown hackers to place these illegal calls."

sonably infer the requisite knowledge or participation by the individual defendants" in the alleged fraudulent scheme]).[7]

■ In the other prong of the fraud cause of action, Cronos alleges that XComIP, by giving Cronos oral assurances that Cronos would not be required to pay for the illegitimate calls, fraudulently induced Cronos to allow XComIP to continue to use Cronos's network, thereby accruing charges that XComIP intended not to pay based on the offset for the charges to Cronos for the fraudulent calls. With regard to XComIP's intent, it is alleged that XComIP "intentionally mislead [sic] Cronos (from November 4, 2015 to December 17, 2015) into believing that these disputed charges would be removed." Further, "[i]n reliance on these false promises of resolving the disputed amounts, . . . Cronos continued to allow XComIP to use Cronos'[s] voice termination services, incurring charges that XComIP would owe Cronos." The loss alleged to have resulted from this fraud, for which the claim seeks recovery, is the same loss alleged in the breach of contract cause of action—XComIP's nonpayment of $54,926.84 of charges for the use of Cronos's network, against which XComIP offset the charges for the fraudulent calls. For the reasons set forth below, we conclude that these allegations do not state a cause of action for fraud (*see New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 318 [1995] ["General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support the (fraud) claim"]; *Rocanova v Equitable Life Assur. Socy. of U.S.*, 83 NY2d 603, 614 [1994] ["a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations"]).

Initially, Cronos's fraud cause of action falls short under the principle that a fraud claim is not stated by allegations that simply duplicate, in the facts alleged and damages sought, a claim for breach of contract, enhanced only by conclusory allegations that the pleader's adversary made a promise while harboring the concealed intent not to perform it. This Court has held numerous times that a fraud claim that "ar[ises] from

---

7. The complaint's failure to "state[ ] in detail" (CPLR 3016 [b]) facts from which XComIP's complicity in the hacking could reasonably be inferred is not remedied by the opposition affidavit submitted by Cronos's chief operating officer, Dinor Adam V. Levi. Levi fails to adduce sufficient facts from which it could reasonably be inferred that XComIP orchestrated the particular fraudulent calls at issue in this dispute.

the same facts [as an accompanying contract claim], s[eeks] identical damages and d[oes] not allege a breach of any duty collateral to or independent of the parties' agreements" is subject to dismissal as "redundant of the contract claim" (*Havell Capital Enhanced Mun. Income Fund, L.P. v Citibank, N.A.*, 84 AD3d 588, 589 [1st Dept 2011]; *see also Fairway Prime Estate Mgt., LLC v First Am. Intl. Bank*, 99 AD3d 554, 557 [1st Dept 2012] [a fraud claim "can be predicated upon an insincere promise of future performance only where the alleged false promise is collateral to the contract the parties executed; if the promise concerned the performance of the contract itself, the fraud claim is subject to dismissal as duplicative" (internal quotation marks omitted)], quoting *HSH Nordbank AG v UBS AG*, 95 AD3d 185, 206 [1st Dept 2012]). Thus, where a fraud claim was supported by allegations that the defendants had "misrepresented . . . their intentions with respect to the manner" in which they would perform their contractual duties, we dismissed the fraud claim as duplicative of the plaintiffs' contract claim because the fraud claim was "based on the same facts that underl[ay] the contract cause of action, [was] not collateral to the contract, and d[id] not seek damages that would not be recoverable under a contract measure of damages" (*Financial Structures Ltd. v UBS AG*, 77 AD3d 417, 419 [1st Dept 2010]). There is no shortage of recent decisions by this Court holding to similar effect.[8]

---

**8.** *See e.g. MMCT, LLC v JTR Coll. Point, LLC*, 122 AD3d 497, 499 (1st Dept 2014) ("A fraud-based cause of action is duplicative of a breach of contract claim when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract" [internal quotation marks omitted]); *Mosaic Caribe, Ltd. v AllSettled Group, Inc.*, 117 AD3d 421, 422-423 (1st Dept 2014) (a fraud claim was insufficient as "duplicative of the breach of contract claim" because it sought "the same [compensatory] damages as the breach of contract claim"); *Laurel Hill Advisory Group, LLC v American Stock Transfer & Trust Co., LLC*, 112 AD3d 486, 487 (1st Dept 2013) (affirming the dismissal of a fraud counterclaim that was "based on the same facts that underl[ay] the contract counterclaim, [was] not collateral to the contract and d[id] not call for damages that would not be recoverable under a contract theory"); *Linea Nuova, S.A. v Slowchowsky*, 62 AD3d 473, 473 (1st Dept 2009) (a fraud claim duplicated a contract claim where the alleged misrepresentation "merely assur[ed] plaintiff that [the defendant] would comply with its contractual obligation and no additional duty was allegedly breached" and "plaintiff sought no damages that were not also recoverable under its breach of contract theory"); *RGH Liquidating Trust v Deloitte & Touche LLP*, 47 AD3d 516, 517 (1st Dept 2008), *lv dismissed* 11 NY3d 804 (2008) (fraud claims were "properly dismissed as duplicative of [the plaintiff's] breach of contract claim, since they [we]re based on alleged

Contrary to the dissent's assertions, Cronos's fraud claim is duplicative of its claim for breach of contract, inasmuch as the only fraud alleged is XComIP's unkept promise to perform certain of its preexisting obligations under the parties' contract (as alleged by Cronos), for which Cronos seeks exactly the same damages as are sought under the rubric of the claim for breach of contract. Based on Cronos's own allegations, Cronos's fraud claim is plainly redundant of its breach-of-contract cause of action. Both the fraud claim and the contract claim seek to recover precisely the same $54,926.84 in charges for allegedly fraudulent calls that XComIP has refused to annul, the charges for which XComIP has instead offset against XComIP's own liability to Cronos, allegedly in violation of Cronos's contractual rights and contrary to XComIP's alleged oral assurances.[9]

As should be apparent from the foregoing, the fraud cause of action adds to the contract cause of action only the allegation that XComIP gave Cronos insincere oral assurances that

---

fraudulent misrepresentations related to defendants' [contractual] obligation . . . and allege[d] no misrepresentations collateral or extraneous to the agreements"); *Coppola v Applied Elec. Corp.*, 288 AD2d 41, 42 (1st Dept 2001) (affirming dismissal of fraud claim as "duplicative" of contract claim where the complaint "did not allege any damages . . . that would not be recoverable under a contract measure of damages" and "failed to plead a breach of duty separate from a breach of the contract"); *accord Bridgestone/Firestone, Inc. v Recovery Credit Servs., Inc.*, 98 F3d 13, 19 (2d Cir 1996) ("intentionally-false statements . . . indicating [an] intent to perform under the contract" are "not sufficient to support a claim of fraud under New York law"); *Doukas v Ballard*, 135 AD3d 896, 897 (2d Dept 2016) (affirming dismissal of fraud claims that "[n]ot only . . . ar[o]se out of identical circumstances as the causes of action alleging breach of contract, but [were] based upon identical allegations, and did not allege that a misrepresentation resulted in any loss independent of the damages allegedly incurred for breach of contract; indeed, the damages sought were identical"); *LIUS Group Intl. Endwell, LLC v HFS Intl., Inc.*, 92 AD3d 918, 920 (2d Dept 2012) (same); *Del Ponte v 1910-12 Ave. U. Realty Corp.*, 7 AD3d 562, 562 (2d Dept 2004) ("Merely alleging scienter in a cause of action to recover damages for breach of contract, unless the representations alleged to be false are collateral or extraneous to the terms of the agreement, does not convert a breach of contract cause of action into one sounding in fraud" [internal quotation marks omitted]).

9. While the complaint demands a larger principal amount ($89,085.24) of damages on the breach-of-contract cause of action than the principal amount sought on the fraud claim ($54,926.84), the recovery sought on the contract claim includes the same $54,926.84 of outstanding charges for allegedly fraudulent calls that the fraud claim seeks to recover. That Cronos's contract claim alleges an additional breach of contract, based on other conduct, for which additional damages are sought, does not change the fact that the fraud claim, in its entirety, duplicates the portion of the contract claim based on XComIP's refusal to annul the $54,926.84 in charges for the fraudulent calls.

XComIP would perform the very same act (reversal of the charges for the fraudulent calls) that Cronos contends, in the contract claim, that XComIP was already contractually obligated to perform under the parties' written agreement. Thus, the allegedly false promise at issue in the fraud claim was, according to the complaint, a promise to perform under the parties' contract, not any promise collateral or extraneous to that contract (*see Havell Capital*, 84 AD3d at 589 [a fraud claim was duplicative of a contract claim where, inter alia, the plaintiff "did not allege a breach of any duty collateral to or independent of the parties' agreements"]; *Linea Nuova*, 62 AD3d at 473 [dismissing a fraud claim where the alleged misrepresentation "merely assur(ed) plaintiff that (the defendant) would comply with its contractual obligation and no additional duty was allegedly breached"]; *RGH Liquidating Trust*, 47 AD3d at 517 [dismissing fraud claims as duplicative because they "allege(d) no misrepresentations collateral or extraneous to the agreements"]; *Orix Credit Alliance v Hable Co.*, 256 AD2d 114, 115 [1st Dept 1998] [dismissing a fraud counterclaim that, "far from being collateral to the contract, . . . was directly related to a specific provision of the contract" (internal quotation marks omitted)]; *Tesoro Petroleum Corp. v Holborn Oil Co.*, 108 AD2d 607, 607 [1st Dept 1985] [dismissing a fraud claim as "redundant" where, inter alia, the plaintiff did not allege the breach of "any duty . . . separate and apart from the contractual duty"], *appeal dismissed* 65 NY2d 637 [1985]).

Moreover, as the dissent concedes, the fraud claim seeks recovery solely for one of the very same losses at issue in the contract claim (the charges for the fraudulent calls), and both claims seek compensatory damages for that loss in the very same principal dollar amount, to the penny (*see Mosaic Caribe*, 117 AD3d at 422-423 [a fraud claim was duplicative because it sought "the same (compensatory) damages as the breach of contract claim"]; *Havell Capital*, 84 AD3d at 589 [a fraud claim was duplicative of a contract claim where, inter alia, the two claims "sought identical damages"]; *Coppola*, 288 AD2d at 42 [affirming the dismissal of a fraud claim that, inter alia, "did not allege any damages . . . that would not be recoverable under a contract measure of damages"]; *Tesoro Petroleum*, 108 AD2d at 607 [same]).

The dissent argues that the fraud claim is not duplicative of the contract claim because the two claims are somehow not "based on the same facts" (*Financial Structures*, 77 AD3d at

419) and the fraud claim—although plainly based on XComIP's failure to perform an alleged contractual duty—is somehow "collateral to the contract" (*id.*). The dissent bases these contentions on the inclusion in the fraud claim—but arguable absence from the contract claim—of allegations that, XComIP, after the parties' agreement was already in effect, and in response to the notice it had received from Cronos of the fraudulent calls, "intentionally mislead [sic] Cronos . . . into believing that these disputed charges would be removed."[10] In other words, the dissent finds that the fraud claim is not redundant of the contract claim because the contract claim alleges only that XComIP failed to perform an alleged contractual duty, while the fraud claim alleges that XComIP failed to follow through on assurances, made after the contract was already in effect, that it would perform that same alleged contractual duty. Thus, according to the dissent, even though one cannot convert a contract claim to a fraud claim by inserting into the pleading "[g]eneral allegations that defendant entered into a contract while lacking the intent to perform it" (*New York Univ.*, 87 NY2d at 318), a litigant may achieve the same result by inserting into the pleading allegations that the other party gave false reassurance that it would perform its obligations under a previously executed agreement. This argument has already been considered and rejected by this Court.

In *Fairway Prime Estate Mgt., LLC v First Am. Intl. Bank* (99 AD3d 554 [1st Dept 2012]), the plaintiff (Fairway) received a commitment letter from the defendant bank (FAIB) to lend funds to finance a development project. Fairway's owner alleged that FAIB, to induce him to sign an agreement to extend FAIB's time to make the loan, had "assured him that defendant would go forward with the Loan, if he signed the document [i.e., the extension agreement] on behalf of plaintiff" (*id.* at 556 [internal quotation marks and brackets omitted]). Ultimately, FAIB did not lend the funds, and Fairway sued for breach of contract and fraud. On Fairway's appeal from the order granting FAIB's motion to dismiss the complaint, we modified to reinstate the contract claim but affirmed the dismissal of the fraud claim as duplicative of the contract claim (*id.* at 557,

---

**10.** In fact, the contract cause of action arguably does contain a reference to XComIP's alleged assurances that the disputed charges would be annulled. Paragraph 72 of the complaint, which is part of the cause of action for breach of contract, states: "By purposely delaying their investigation of these fraudulent calls, promising to re-open the matter, and then refusing to indemnify Cronos for these calls, XComIP breached the Agreement."

citing *HSH Nordbank*, 95 AD3d at 206). In so doing, we rejected Fairway's argument that the fraud claim concerned a misrepresentation collateral to FAIB's contractual obligations under the commitment letter because (as stated in Fairway's appellate brief) "Fairway has never claimed [that] FAIB entered into the Term Sheet or Commitment with the fraudulent intention of breaching them. Instead, Fairway asserts that FAIB developed 'lenders [sic] remorse' as the credit markets deteriorated *afterwards. Later on*, FAIB pretended that the loan would [still] take . . . place . . . ." Because *Fairway* rejected the foregoing argument, the case stands for the proposition that a false assurance that the promisor will perform a preexisting contractual obligation is *not* collateral to the contract—a holding that fully applies to this case, whether or not *Fairway* involved an issue of contractual ambiguity.[11]

We do not take issue with the dissent's point that making a promise to do something in the future, while harboring an undisclosed intention to break that promise when the time comes to perform, constitutes a misrepresentation of an existing fact (*see Deerfield Communications Corp. v Chesebrough-Ponds, Inc.*, 68 NY2d 954, 956 [1986]). What the dissent loses sight of, however, is that, under our case law, where the promised performance is an obligation of the promisor under an enforceable contract between the parties, and the only damages sought are those recoverable for a breach of contract, allegations of such an "insincere promise" (*Castellotti v Free*, 138 AD3d 198, 211 [1st Dept 2016]) are redundant of a claim for breach of the parties' contract and, therefore, do not state a cause of action for fraud.

The rule that an insincere promise to perform a contractual obligation is not actionable as fraud—absent which contract claims would be routinely pleaded in the alternative as fraud—

---

**11.** *See also Metropolitan Transp. Auth. v Triumph Adv. Prods.*, 116 AD2d 526, 527-528 (1st Dept 1986) (dismissing a fraud claim against the president of a corporation alleged to have breached its contract with the MTA on the ground that "only a breach of the representation of performance implicit in making the bid . . . and *a subsequent assurance of performance* by [the president]" were alleged, which allegations were "redundant in light of the first cause of action for breach of contract against the corporate defendant" [emphasis added]); *cf. Bridgestone/Firestone*, 98 F3d at 19 (holding that pleadings and evidence that the defendants "knowingly and falsely represented to [the plaintiff] that [the indebted defendant] intended to remit all sums due and owing to [the plaintiff] under the [preexisting] Collection Agreement" were legally insufficient to support a judgment for fraud under New York law [internal quotation marks omitted]).

guards against the erosion of the distinction between the two causes of action. This distinction serves to prevent the expansion of potential liability for conduct essentially constituting a breach of contract to persons and entities not in contractual privity with the plaintiff. The distinction should also be maintained given that "[f]raud is wrongful enough to occupy a civil classification just short of criminal conduct" (*Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 348 [1999]). In contrast, the law recognizes that, generally, a party may breach an agreement if that party is prepared to bear the resulting liability to the other. "The option to breach a contract and pay damages is always available, even where the breaching party had no intention of performing its obligations when it entered into the agreement" (*Banc of Am. Sec. LLC v Solow Bldg. Co. II, L.L.C.*, 47 AD3d 239, 248 [1st Dept 2007], citing *Briefstein v Rotondo Constr. Co.*, 8 AD2d 349, 351 [1st Dept 1959]). As this Court stated in *Briefstein*:

> "To say that a contracting party intends when he enters into an agreement not to be bound by it is not to state 'fraud' in an actionable area, but to state a willingness to risk paying damages for breach of contract. . . . Implicit in the policy sanctioning the formalization of contractual undertakings is precaution against an existing intention not to be bound by the agreement as well as a future change of mind about being bound by it. Actionable relief hangs on breach; and . . . relief does not lie for fraud resting on an intention not to perform" (*id.*).

The Court of Appeals' decision in *Deerfield Communications Corp. v Chesebrough-Ponds, Inc.* (68 NY2d 954 [1986]), upon which the dissent mistakenly relies, is not to the contrary. The false promise held to be actionable as fraud in *Deerfield* was a promise that had *not* been included in the terms of the parties' written agreement.[12] For that reason, the extra-contractual promise in *Deerfield* was held to have been "collateral to . . . the contract" (68 NY2d at 956) and, therefore, the fraud claim did not duplicate the contract claim (*id.*). The dissent's misreading of *Deerfield* to mean that a party's misrepresentation of its intention to abide by the terms of its contract concerns a mat-

---

12. *Deerfield* involved an oral promise by the buyer of certain inventory not to resell the merchandise in certain territories, which restriction was not set forth in the parties' integrated written agreement (68 NY2d at 956).

ter collateral to that contract renders the word "collateral" meaningless and finds no support in the language or reasoning of the Court of Appeals. Moreover, the dissent's misinterpretation of *Deerfield* is contrary to the great weight of our case law, which recognizes that *Deerfield* confirms the rule that a false promise is actionable as fraud only if the promised performance is outside the terms of any contract between the parties (*see HSH Nordbank*, 95 AD3d at 206; *Wilshire Westwood Plaza LLC v UBS Real Estate Sec., Inc.*, 94 AD3d 514, 516 [1st Dept 2012]; *Triton Partners v Prudential Sec.*, 301 AD2d 411, 411 [1st Dept 2003]; *Glanzer v Keilin & Bloom*, 281 AD2d 371, 372 [1st Dept 2001]; *Orix*, 256 AD2d at 115; *accord Bridgestone/ Firestone*, 98 F3d at 20; *Global Funding Group, LLC v 133 Community Rd., Ltd.*, 2017 WL 1944194, *4-5, 2017 US Dist LEXIS 71446, *12-13 [ED NY, May 10, 2017, 15 CV 6595 (DRH) (AKT)]).[13]

The dissent draws a distinction between different ways of expressing the concept of a false promise, that is to say, a promise made while the promisor intended not to keep it. Thus, the dissent states that the promises XComIP allegedly made "while harboring no intention of honoring them . . . constituted misrepresentations of present fact rather than mere insincere promises of future performance." The distinction here drawn by the dissent between promises made "while harboring no intention of honoring them," on the one hand, and "mere insincere promises of future performance," on the other hand, cannot withstand scrutiny and, so far as we are aware, has not

---

**13.** As this Court has previously recognized (*see Coppola*, 288 AD2d at 42; *J.E. Morgan Knitting Mills v Reeves Bros.*, 243 AD2d 422, 423 [1st Dept 1997]; *Big Apple Car v City of New York*, 234 AD2d 136, 138 [1st Dept 1996]), the fraud alleged in *Graubard Mollen Dannett & Horowitz v Moskovitz* (86 NY2d 112 [1995]) was—like the fraud in *Deerfield*, but unlike the alleged fraud here—extraneous to the parties' agreement. Also inapposite are three cases of this Court cited by the dissent, in which the fraud claims were not based on alleged misrepresentations of the defendants' intentions to perform their contractual obligations in the future (*see American Media, Inc. v Bainbridge & Knight Labs., LLC*, 135 AD3d 477, 477-478 [1st Dept 2016] [the defendant allegedly misrepresented "the capitalization of Bainbridge and the existence of an $850,000 account receivable"]; *GoSmile, Inc. v Levine*, 81 AD3d 77, 80 [1st Dept 2010] ["plaintiff alleged that defendant lied to plaintiff when he represented and warranted that he had never breached and was not currently in breach" of an earlier agreement], *lv dismissed* 17 NY3d 782 [2011]; *First Bank of Ams. v Motor Car Funding*, 257 AD2d 287, 292 [1st Dept 1999] ["plaintiff's fraud claim is premised on allegations that defendants misrepresented various pertinent facts about the individual loans that plaintiff purchased"]).

previously been recognized in our case law (*see Castellotti*, 138 AD3d at 211 ["the fraudulent inducement claim was properly dismissed because it alleges only *an insincere promise of future performance under the oral contract*" (emphasis added)], citing *Forty Cent. Park S., Inc. v Anza*, 117 AD3d 523, 524 [1st Dept 2014] ["the complaint fails to state a cause of action for fraudulent inducement, since it essentially alleges that defendant *did not intend to perform under the contract when he made the promissory statements*" (emphasis added)]).

Similarly unsound is the dissent's attempt to distinguish *Tesoro Petroleum* on the ground that the defendants in that case "falsely promised to perform 'future acts'" (quoting 108 AD2d at 607). In *Tesoro Petroleum*, just as in this case, the plaintiff alleged in its fraud claim that the defendants had "misrepresented their intent to perform as promised" in the parties' contract (*id.*), and we held that these allegations were "redundant" of the contract claim (*id.*). The dissent cannot distinguish this case from *Tesoro Petroleum* by referring to XComIP's allegedly misrepresented intentions as "contemporaneous plans." Assuming the truth of Cronos's allegations, when XComIP assured Cronos that "the dispute *would be* resolved in Cronos'[s] favor" (emphasis added), and *"promise[d]* to 'handle' or 'deal with' the problem"* (emphasis added), XComIP was representing that the charges would be removed in the future, not that they were being removed at that very moment. Indeed, it is clear from the complaint itself that Cronos understood XComIP's assurances to be promises of future conduct. Cronos specifically alleges—as it must to support a fraud claim—that it relied on XComIP's assurances that the charges would ultimately be reversed by "continu[ing] to allow XComIP to use Cronos'[s] voice termination services."[14] Cronos alleges that it relied on the alleged assurances for about a month and a half (from November 4 to December 17), and that its reliance continued for 10 days after it received email notice on December 7 that XComIP would not reverse the charges.

Although Cronos itself does not make this argument, the dissent takes the position that the fraud cause of action should be sustained in the event the aforementioned ambiguity in section 9 of the RNCSA is ultimately resolved in favor of XComIP,

---

**14.** Similarly, in his opposition affidavit, Cronos's chief operating officer states that "[XComIP's] promises were relied on by and induced Cronos to continue giving [XComIP] access to its services, as well as allowing Cronos clients to use [XComIP's] IPRNs."

resulting in the dismissal of the portion of the contract claim that we find to be duplicated by the fraud claim. While this theory might seem plausible at first glance, it cannot withstand closer scrutiny. If XComIP's interpretation of the RNCSA prevails, that outcome will necessarily be based upon a determination that the parties, when they entered into the agreement, intended it to operate as XComIP now contends, placing the risk of fraud upon the party using the other's services (here, Cronos) in the relevant instance. If this is what the parties intended when they contracted, it would mean that, according to the complaint, XComIP gave Cronos assurances, apparently gratis, that XComIP would bear a loss that the parties had agreed would, in that situation, be borne by Cronos. We do not believe that Cronos reasonably could have relied upon an assurance that it would receive what, under XComIP's interpretation of the contract, essentially would have been a gift from one business to another. Therefore, should XComIP's reading of section 9 be correct, Cronos's fraud claim must fail for lack of justifiable reliance (*see e.g. ACA Fin. Guar. Corp. v Goldman, Sachs & Co.*, 25 NY3d 1043, 1044 [2015] ["To plead a (fraud) claim . . . , plaintiff must allege facts to support the claim that it justifiably relied on the alleged misrepresentations"]).[15]

Moreover, the dismissal of the fraud cause of action is required on the ground that it is "based upon a statement of future intention [but fails to] allege facts to show that the defendant, at the time the promissory representation was made, never intended to honor or act on [its] statement" (*Laura Corio, M.D., PLLC v R. Lewin Interior Design, Inc.*, 49 AD3d 411, 412 [1st Dept 2008] [internal quotation marks omitted]), a principle implicit in the Court of Appeals' aforementioned statement that "[g]eneral allegations that defendant entered into a contract while lacking the intent to perform it are insufficient

---

**15.** We also note that the case the dissent cites in support of this argument actually stands for the opposite proposition (*see Demetre v HMS Holdings Corp.*, 127 AD3d 493, 493-494 [1st Dept 2015] [affirming the dismissal of a fraud claim as "duplicative of the breach of contract claim," although the provision of the agreement on which the contract claim was based was "ambiguous"]; *accord Global Funding Group*, 2017 WL 1944194, *4, 2017 US Dist LEXIS 71446, *10, *12-13 [in a case governed by New York law, denying a motion to dismiss the claims for breach of contract on the ground that the relevant contractual provisions were "ambiguous" while dismissing the fraud claim "because it rest[ed] entirely upon allegations that defendants did not intend to comply with the terms of the contract" and "d[id] not allege any misrepresentations collateral or extraneous to the contract"]).

to support the [fraud] claim" (*New York Univ.*, 87 NY2d at 318). As this Court has explained,

> "Absent a present intention to deceive, a statement of future intentions . . . is not actionable on the grounds of fraud. A complaint based upon a statement of future intention must allege facts to show that the defendant, at the time the promissory representation was made, never intended to honor or act on his statement" (*Non-Linear Trading Co. v Braddis Assoc.*, 243 AD2d 107, 118 [1st Dept 1998] [internal quotation marks and citation omitted], quoting *Lanzi v Brooks*, 54 AD2d 1057, 1058 [3d Dept 1976] [further noting that "any inference drawn from the fact that the expectation did not occur is not sufficient to sustain the plaintiff's burden of showing that the defendant falsely stated his intentions"], *affd* 43 NY2d 778 [1977]).

The dissent apparently does not dispute the principle that, where a fraud claim is based upon an alleged false promise, the plaintiff is required to plead specific facts from which it may be reasonably inferred that the defendant did not intend to keep the promise when it was made (*see* CPLR 3016 [b] [in pleading a fraud cause of action, "the circumstances constituting the wrong shall be stated in detail"]). The dissent, however, believes that the fraud claim before us meets this standard because the complaint alleges that XComIP "*immediately* offset the amount of fraudulent charges against legitimate use charges incurred by XComIP for Cronos'[s] Services" (emphasis added). In our view, the word "immediately" cannot bear the weight the dissent places upon it.

To begin, although Cronos obviously knows when it received the allegedly wrongful billing, the complaint does not allege how much time passed between XComIP's alleged misrepresentations that Cronos would not be charged for the fraudulent calls and the appearance of those charges on bills. But more fundamentally, the claim that XComIP's wrongful conduct was the initial billing for the fraudulent calls (billing that was presumably generated automatically), rather than the ultimate refusal to reverse the charges in accord with the alleged promises to Cronos, is at odds with Cronos's own account of how the parties operated under their agreement.

The complaint alleges that section 9 of the RNCSA—the provision that XComIP allegedly breached by refusing to reverse

the charges in question—"required the Party receiving payment [here, XComIP] to indemnify the Paying party [here, Cronos] in the event that 'allegedly fraudulent calls' were previously paid for." Cronos's appellate brief elaborates on this point as follows:

> "[T]his type of provision [referring to section 9] is specifically tailored to internet[-]based telecommunications and IPRN/IPRS services. Specifically, telecommunication services are carried by multiple different carriers before finally being delivered to an end user ('terminated') by a carrier (in the case of IPRN/IPRS usage, the terminating party would be the service provider, such as [XComIP]). Parties can only be assured that they are paid by those with whom they are in privity of contract. *Therefore, agreements often require the party using the service to pay up-front, regardless of whether the traffic paid for was real or fraudulent. The remedy for a party forced to pay up-front for calls that later turn out to be fraudulent (which is common in telecommunications) is to seek indemnification from the party they paid for the usage*" (emphasis added).

To the same effect, Levi, the chief operating officer of Cronos, explains in his opposition affidavit that he understood that Cronos was required to pay XComIP's charges for the fraudulent calls "immediately," and that section 9 of the RNCSA (as interpreted by Cronos) required XComIP *subsequently* to indemnify Cronos for those charges:

> "It is the nature of the telecommunications business that all providers who generate income by charging other providers (and not end users) must be paid immediately, since they in turn have costs to cover. The purpose of indemnity is to force the party benefiting [sic] from the fraud to pay back the party aggrieved by it; however, because of the custom mentioned above, indemnity cannot be used as an immediate defense to payment. . . . The very nature of indemnity is we must pay the initial charge, and then be covered for it later" (paragraph numbers and paragraph breaks omitted).

Thus, Cronos, by its own account, contemplated that it would initially be billed for the fraudulent calls, but expected that the charges would ultimately be reversed pursuant to its request.

In fact, as previously noted, Cronos continued to await the reversal of the charges for 10 days after XComIP notified it by email that the charges would *not* be reversed. Therefore, the appearance of the charges on bills "immediately" after XComIP's alleged assurances that Cronos would not have to pay for the fraudulent calls does not give rise to any inference that the assurances (assuming that XComIP made them) were fraudulent when given.

In arguing that scienter may be inferred from the vague allegation that Cronos was billed for the fraudulent calls "immediately," the dissent completely ignores the fact that, under Cronos's own interpretation of the parties' agreement, the initial billing for the calls was completely consistent with the contract. The dissent also ignores the fact that Cronos itself, based on its own allegations, did not understand the "immediate" billing to have been inconsistent with the assurances alleged to have constituted the fraud. Given that the parties' written agreement, the allegations of the complaint and Cronos's own appellate arguments establish that the "immediate" billing for the fraudulent calls was consistent with both the contract and the alleged oral assurances that the charges would be reversed, we fail to see how scienter can be inferred from that billing—which, given that the relevant events took place in 2015, was no doubt generated automatically. One cannot infer that XComIP did not intend to honor its alleged assurances from an act that was completely consistent with those assurances, as pleaded by Cronos itself.[16]

Finally, we turn to the six causes of action we have not yet discussed. The complaint states a cause of action for an account stated only with respect to $34,158.40 of the charges at issue, as to which XComIP is alleged never to have raised an objection. The remaining amount at issue ($54,926.84), having been disputed when XComIP offset it against the charges to Cronos for the allegedly fraudulent calls, cannot support an account stated claim (*see Fleming v Vassallo*, 43 AD3d 278, 278-279 [1st Dept 2007]). The five remaining claims should have been dismissed. Because plaintiff has an adequate legal remedy for breach of contract, the cause of action for a declaratory judgment should be dismissed (*Singer Asset Fin. Co., LLC v Melvin*, 33 AD3d 355, 358 [1st Dept 2006]). Similarly, because

---

**16.** We disagree with the dissent's statement that an issue exists as to whether XComIP's "assurances were promises of future rather than contemporaneous acts." By definition, a promise is always of future conduct.

the matters at issue are governed by a written agreement, the quantum meruit and unjust enrichment claims should have been dismissed (*MG W. 100 LLC v St. Michael's Prot. Episcopal Church*, 127 AD3d 624, 626 [1st Dept 2015]). The conversion claim is legally insufficient because it merely restates a claim for damages for breach of contract, based on a failure to pay charges allegedly due and owing, and does not allege a deprivation of any possessory interest held by Cronos in any particular property (*see TOT Payments, LLC v First Data Corp.*, 128 AD3d 468, 469 [1st Dept 2015]). The claim for tortious interference with business relations is legally insufficient because Cronos does not allege that XComIP's conduct harmed Cronos's relationship with any of its customers (*see Amaranth LLC v J.P. Morgan Chase & Co.*, 71 AD3d 40, 47 [1st Dept 2009], *lv dismissed in part, denied in part* 14 NY3d 736 [2010]).

Accordingly, the order of the Supreme Court, New York County (Barry Ostrager, J.), entered August 17, 2016, which denied defendants' motion to dismiss the complaint, should be modified, on the law, to grant the motion as to the causes of action for a declaratory judgment, fraud, quantum meruit, conversion, tortious interference with business relations, and unjust enrichment, and as to the cause of action for an account stated to the extent of $54,926.84 of the charges at issue, and otherwise affirmed, without costs.

KAHN, J. (dissenting in part). While I otherwise concur with the majority's disposition of this appeal, I would affirm the order appealed from to the extent that it denied dismissal of the portion of plaintiff's fraud cause of action based upon the allegations that defendant Jay Adams made false promises to a principal of plaintiff Cronos to reverse charges related to fraudulent calls, as I believe that aspect of the fraud claim to have been sufficiently pleaded, at this preliminary stage, to survive a motion to dismiss. Therefore, I respectfully dissent in part.

To the extent that the fraud claim is based on allegations that Adams, an executive of XComIP, misrepresented to Dinor Adam V. Levi, the chief operating officer of plaintiff Cronos, that plaintiff would not be liable for the fraudulent calls, the complaint alleges facts permitting a reasonable inference that he did so for the purpose of inducing plaintiff to continue allowing defendants to use plaintiff's services (*see Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553, 559 [2009]). Where an appeal involves an order deciding a motion

to dismiss, the complaint is afforded a liberal construction, all factual allegations in the complaint are deemed true and the plaintiff is entitled to all favorable inferences (*Leon v Martinez*, 84 NY2d 83, 87 [1994]). Here, the complaint alleges that on two occasions, Adams made misrepresentations to plaintiff's representative Levi that the dispute would be resolved in plaintiff's favor and that plaintiff would not need to compensate defendant XComIP for the fraudulent calls. The allegation that, on both occasions, XComIP billed plaintiff for the fraudulent calls immediately following these misrepresentations by Adams, viewed most favorably to plaintiff, suffices, on this motion to dismiss, to allege that Adams knew that the statements were false when he made them.

Adams's alleged assurances to Cronos that it would not have to pay demonstrate defendant Adams's intent to induce plaintiff's reliance on his assurances. The allegation that plaintiff continued to allow XComIP to use plaintiff's voice termination services after plaintiff's representative received Adams's assurances establishes plaintiff's justifiable reliance upon those assurances at a time when plaintiff had no reason not to take Adams at his word, especially following the first occasion on which defendant Adams allegedly gave those assurances to plaintiff. As a result, XComIP allegedly incurred further charges owing to plaintiff of $54,926.84. Thus, plaintiff has pleaded fraud with sufficient particularity as to Adams (*see* 12 NY3d at 559).

Furthermore, Adams may be held personally liable on the portion of the fraud claim in question, notwithstanding his position as an officer of a limited liability company, because he is alleged to have personally participated in the commission of a tort in furtherance of company business (*see Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486, 491 [2008]; *277 Mott St. LLC v Fountainhead Constr. LLC*, 83 AD3d 541, 542 [1st Dept 2011]; *Rothstein v Equity Ventures*, 299 AD2d 472, 474 [2d Dept 2002]).

Moreover, under the doctrine of in pari delicto, the portion of the fraud claim involving Adams's allegedly false promises may be imputed to XComIP unless the "adverse interest" exception to imputation exists, in which the executive or agent has "*totally abandoned* his principal's interests and [is] acting *entirely* for his own or another's purposes" (*New Greenwich Litig. Trustee, LLC v Citco Fund Servs. [Europe] B.V.*, 145 AD3d 16, 23 [1st Dept 2016], quoting *Kirschner v KPMG LLP*, 15 NY3d

446, 465, 466 [2010] [internal quotation marks omitted]). Under the circumstances alleged here, where Adams's assurances permitted XComIP to continue to have the benefit of plaintiff's services without paying for them, and where he was not acting entirely for his own purposes, the adverse interest exception does not apply, however. Thus, the portion of the fraud claim should not be dismissed as to either Adams or XComIP.

The aspect of the fraud claim alleging that Adams made false promises to Cronos is not duplicative of the breach of contract claim. In order for a fraud claim to be duplicative of a breach of contract claim, the fraud claim must be "based on the same facts that underlie the contract cause of action, [must] not [be] collateral to the contract, and [must] not seek damages that would not be recoverable under a contract measure of damages" (*Financial Structures Ltd. v UBS AG*, 77 AD3d 417, 419 [1st Dept 2010]).

With respect to the first *Financial Structures* prong, whether both claims are based on the same facts, here, the breach of contract claim makes no clear reference to the false promises made by Adams to Levi and Cronos to remove the disputed charges for the fraudulent calls, while the fraud claim clearly includes them. Therefore, viewing the complaint most favorably to plaintiff, the fraud claim is not based on the same facts that underlie the contract cause of action.

With regard to the second *Financial Structures* prong, whether the fraud claim is not collateral to the contract, we have explained that, in a case involving allegations of both breach of contract and fraud, "[a] misrepresentation of present fact is collateral to [a] contract and supports a separate claim for fraud" (*American Media, Inc. v Bainbridge & Knight Labs., LLC*, 135 AD3d 477, 478 [1st Dept 2016], citing *Deerfield Communications Corp. v Chesebrough-Ponds, Inc.*, 68 NY2d 954, 956 [1986] ["a promise . . . made with a preconceived and undisclosed intention of not performing it, . . . constitutes a misrepresentation . . . of present fact" collateral to, not duplicative of, a breach of contract claim (citations and internal quotation marks omitted)]).

Here, tellingly, the portion of the fraud claim in question alleges that, on two occasions, following Adams's promises to Cronos that XComIP would remove the disputed charges for the fraudulent calls, "XComIP immediately offset the amount of fraudulent charges against legitimate use charges incurred

by XComIP for Cronos' [s]ervices." Based upon these allegations of two instances of immediate billing of Cronos by XComIP following Adams's assurances to the contrary, it is readily inferable that Adams made these promises with the preconceived and undisclosed intention of not performing them. At the very least, at the time of the second instance of immediate billing of Cronos for disputed charges following Adams's promises that such charges would be removed, Adams clearly would have made the promises to Cronos, while harboring no intention of honoring them. As Adams's alleged promises constituted misrepresentations of present fact rather than mere insincere promises of future performance, the alleged misconduct here is collateral to the contract (*see Deerfield*, 68 NY2d at 956; *American Media*, 135 AD3d at 478; *GoSmile, Inc. v Levine*, 81 AD3d 77, 81 [1st Dept 2010], *lv dismissed* 17 NY3d 782 [2011]).

The majority bases its conclusion that Adams's alleged assurances to Cronos are not collateral to the contract on its view that these alleged promises are nothing more than promises made on behalf of XComIP to fulfill its preexisting contractual obligation to indemnify Cronos for expenses arising from fraudulent calls in accordance with section 9 of the agreement. As the majority concedes, section 9 also states that each party to the agreement is obligated to pay invoices from the other party, even if the invoices are for charges related to fraudulent calls. Given the ambiguity of section 9 of the agreement as to whether each party is responsible for payment of fraudulent invoices from the other party, or is entitled to indemnity from the other party, there is no basis upon which this Court can presently determine whether XComIP had any preexisting contractual obligation to reverse its charges (*see New York Univ. v Pfizer Inc.*, 151 AD3d 42, 48 [1st Dept 2017] ["because section 9's language . . . is ambiguous, we cannot determine on this motion to dismiss that either party's interpretation of the agreement controls as a matter of law"]). Where, at the pleading stage of the proceedings, there are undeveloped issues concerning a breach of contract claim due to the ambiguity of a contractual provision, it is premature to dismiss another claim, such as the portion of the fraud claim in question here, as duplicative, and both claims should be permitted to stand (*Demetre v HMS Holdings Corp.*, 127 AD3d 493, 493-494 [1st Dept 2015]).

Thus, as in these recent cases, as well as in *Deerfield*, the promises allegedly made by Adams cannot, at this juncture, be

said to have been demonstrably based upon any preexisting contractual obligation. Therefore, when viewed in the light most favorable to plaintiff, Adams's promises were collateral to the contract (*see Deerfield*, 68 NY2d at 956).

In this case, the analysis to be performed under the second prong of the *Financial Structures* rubric in order to determine whether the fraud claim is duplicative necessarily involves determining the nature of Adams's intent in making promises to Cronos, as may be reasonably inferred from the factual allegations presented. Thus, although the principles governing whether claims are duplicative are separate and distinct from those governing whether an intent to defraud on the part of a defendant (in this case, Adams) may reasonably be inferred from the factual allegations presented, application of those two sets of principles necessarily converge in this case, with the principles governing reasonable inference of intent being applied in furtherance of one step of the overall inquiry as to whether the portion of the fraud claim in question is duplicative.

In reaching the conclusion that Adams's promises were not collateral to the agreement, the majority's reliance on *Fairway Prime Estate Mgt., LLC v First Am. Intl. Bank* (99 AD3d 554 [1st Dept 2012]) and *Castellotti v Free* (138 AD3d 198 [1st Dept 2016]), is misplaced. Neither *Fairway* nor *Castellotti* involved an ambiguous contractual provision that called into question whether the defendant who allegedly made a false or insincere promise had a preexisting contractual obligation to perform what was promised. Here, by contrast, as discussed above, the ambiguous provisions of section 9 of the agreement, if construed in the light most favorable to plaintiff, would mean that defendants XComIP and Adams were under no preexisting contractual obligation to perform the false promises allegedly made by Adams, thereby rendering those false promises collateral to the agreement.

Moreover, this is not a case where the alleged promises made by a defendant (in this case, Adams) are not indicative of "a present intention to deceive" because the complaint does not "allege facts to show that the defendant [Adams], at the time the promissory representation was made, never intended to honor or act on his statement" (*Non-Linear Trading Co. v Braddis Assoc.*, 243 AD2d 107, 118 [1st Dept 1998] [internal quotation marks omitted], quoting *Lanzi v Brooks*, 54 AD2d 1057, 1058 [3d Dept 1976], *affd* 43 NY2d 778 [1977]). Rather, viewed

in the light most favorable to plaintiff, the allegation of the immediate billing of Cronos by XComIP on both occasions following Adams's assurances to the contrary, and the ambiguity in paragraph 9 of the agreement, which could be construed as imposing no preexisting contractual obligation upon defendants, establish Adams's intention not to honor his promises, which were collateral to the agreement, at the time he made them (cf. Non-Linear, 243 AD2d at 118).

Our decision in *First Bank of Ams. v Motor Car Funding* (257 AD2d 287 [1st Dept 1999]), cited by the majority, supports this position. There, both breach of contract and fraud claims had been alleged but the fraud claim had been dismissed, and this Court reinstated the fraud claim on the ground that the defendants' alleged misrepresentations about loans purchased under the agreement in question constituted "statement[s] of present fact" (*id.* at 292, 294). In *Tesoro Petroleum Corp. v Holborn Oil Co.* (108 AD2d 607 [1st Dept 1985], *appeal dismissed* 65 NY2d 637 [1985]), also cited by the majority, where the complaint had alleged both breach of contract and fraud claims, we affirmed the dismissal of the fraud claim because that claim was based solely upon the plaintiff's allegations that the defendants falsely promised to perform "future acts" pursuant to the terms of the contract (*Tesoro*, 108 AD2d at 607). Here, by contrast, the promises made by Adams to Cronos, as alleged by plaintiff, misrepresented Adams's contemporaneous plans, which were immediately effected. From the allegation that Adams's assurances were followed by the immediate billing of Cronos for the fraudulent calls, it may be reasonably inferred that Adams never harbored the slightest intention of honoring his promise to reverse the charges to Cronos for those calls. Additionally, as noted, whether or not Adams's statements related to his preexisting obligations under the contract cannot be determined at this juncture.

In maintaining that Cronos's prolonged reliance on Adams's promises over a period of approximately 1½ months, as demonstrated by Cronos's permitting XComIP continued access to Cronos's services, indicates that Cronos regarded Adams's promises as promises to perform future acts, the majority conflates two separate and distinct elements of fraud. On the one hand, there is the element of intent to defraud, which is a matter of the intent of the alleged defrauder (in this case, Adams), not of the allegedly defrauded plaintiff (in this case, Cronos). On the other hand, there is the element of reliance, which

is a matter of whether the allegedly defrauded plaintiff believes a false promise to be true and acts accordingly. Put otherwise, in determining whether, in this case, Adams's assurances were promises of future rather than contemporaneous acts, the determination is not governed by Cronos's perception of the meaning of those promises. Rather, it is governed by what Adams's intentions were in making them.

The third *Financial Structures* prong examines whether the damages sought under the fraud claim would not be recoverable under a contract measure of damages. As the majority correctly points out, the $54,926.84 sought in the fraud claim is included within the $89,085.24 sought on the breach of contract claim, and therefore may also be recoverable under a contract measure of damages. Nonetheless, because *Financial Structures* requires that all three of its criteria be satisfied in order for a fraud claim to be duplicative of a breach of contract claim, and because the portion of the fraud claim in question here does not meet two out of the three *Financial Structures* criteria, it is not duplicative of the breach of contract claim in this case.

Accordingly, I would affirm the order of Supreme Court to the extent that it denied defendants' motion to dismiss that portion of plaintiff's fourth cause of action, for fraud, alleging that Adams had made false promises to a principal of plaintiff.

RICHTER and KAPNICK, JJ., concur with FRIEDMAN, J.P.; KAHN, J., dissents in part in a separate opinion.

Order Supreme Court, New York County, entered August 17, 2016, should be modified, on the law, and otherwise affirmed, without costs.